4 F.3d 291
 17 Employee Benefits Ca 1556
 Ronald J. BIGGERS; James E. Brandon; Linda M. Cornwell;
James A. Dunn; Kenneth W. Elliott; Betty L. Griffin;
Robert L. Jackson; Terry K. Jewell; Kenneth Jordan;
Charles E. Lackey; Raymond W. Lamberth; John Edward
Miller, Jr.; Robert A. Munse; Deborah W. Stanton; John H.
Starnes; Gary Sweeney; Joanne M. Veillette; Jerry E.
Wingate; Glenn Breitwieser, Plaintiffs-Appellees,
v.
WITTEK INDUSTRIES, INCORPORATED, Defendant-Appellant,
and
J.D. Industries, Incorporated; Chrysler Corporation;
Carmen Viana; John W. Darrah, Defendants.
 No. 92-2139.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 5, 1993.
Decided Aug. 27, 1993.
 
 George Clive Hook, II, George C. Hook, P.C., Chicago, IL, argued, for defendant-appellant.
 Eric Robert Meierhoefer, Charlotte, NC, argued (Mark A. Michael, on brief), for plaintiffs-appellees.
 Before ERVIN, Chief Judge, and NIEMEYER and WILLIAMS, Circuit Judges.
 NIEMEYER, Circuit Judge:
 
 
 1
 Wittek Industries, Inc., a corporation engaged in the manufacture of automobile parts, closed its EC Manufacturing Division at Pineville, North Carolina, on February 15, 1991, and terminated the employment of those working at the plant. Applying a 1989 written policy which provided for a maximum of three weeks of severance pay, Wittek Industries paid each of the employees those benefits. Ronald J. Biggers and 17 other employees contended the 1989 policy had never been adopted, and they sued Wittek Industries under ERISA claiming entitlement to additional severance benefits under a more generous, preexisting 1987 policy. Following trial the court awarded the employees $112,526.37 in additional severance benefits under the 1987 policy.
 
 
 2
 In a separate action, consolidated with the first, Glenn Breitwieser, a vice president of manufacturing of Wittek Industries, who was also terminated in February 1991, likewise sued Wittek Industries for severance benefits under an alleged individual contractual arrangement. The court submitted his claim to a jury under Illinois common law and the jury awarded him $99,187.50.
 
 
 3
 On appeal of the judgment embodying both awards, Wittek Industries now contends that (1) the award to Biggers and the 17 other employees of benefits under the 1987 company policy was improper because that policy had been duly replaced by the 1989 policy; (2) Breitwieser's contract claim was preempted by ERISA and any ERISA claim that Breitwieser might have should have been decided by the court and not by the jury; (3) the contract under which Breitwieser sued was never established and in any event, as alleged, was unenforceable; and (4) the award to plaintiffs of attorney's fees was improper because Wittek Industries was never given the opportunity to respond to the motion for such fees.
 
 
 4
 For the reasons that follow, we affirm the judgment in favor of Biggers and the other 17 former employees of Wittek Industries; we vacate the judgment in favor of Breitwieser because his claim is preempted by ERISA and remand his claim for a new trial by the court; and we vacate the order awarding attorney's fees, remanding that issue for further proceedings.
 
 
 5
 * The EC Manufacturing Division of Wittek Industries, Inc., operated a plant in Pineville, North Carolina, that was engaged in the manufacture of "door rods," part of the locking device found in automobile doors, which were sold principally to Chrysler Corporation. Because of financial difficulties, the plant was closed on February 15, 1991, and its assets were sold. As a result, the employment of those working at the plant was terminated. Ronald J. Biggers and 17 other employees filed suit against Wittek Industries under ERISA claiming severance benefits under a written company policy dated June 1, 1987. The policy provided for "a severance allowance of one (1) week of pay at the regular base rate for each full year of continuous uninterrupted service" up to a maximum of 20 weeks.
 
 
 6
 Wittek Industries refused to pay the benefits provided under the 1987 policy, contending that that policy had been replaced by a new written policy dated June 1, 1989. The company claimed that it had properly paid the employees under the 1989 policy, which provided severance benefits of one week's pay for one to three years' service; two weeks' pay for three to five years' service; and a maximum of three weeks' pay for service of five years and more. The employees contended that they had neither heard of nor seen the 1989 policy and they maintained that it was never put into effect. The issue of whether the employees were entitled to the more generous amounts provided by the 1987 policy was tried to the district court without a jury.
 
 
 7
 At trial Ray Keegan, Wittek Industries' director of human resources, testified that when Carmen Viana became president of Wittek Industries, she was "flabbergasted" at the generosity of the severance and other employee benefits then provided for in the company's written policies. She instructed Keegan to redraft the policies, which he did in early 1989. Keegan's assistant, Marge Husch, testified that she typed the new policies and put them, unsigned, into a locked file cabinet. She also testified that Keegan had her make a copy of the policies to give to Viana to look at, approve, and sign. To Husch's knowledge, as of March 19, 1991, more than a month after the plant in Pineville had been closed, none of the new policies that she typed had been approved and signed by Viana. Indeed, Keegan often complained to Husch that he was unable to get Viana to sign any of the new policies.
 
 
 8
 Shortly before the closing of the Pineville plant, James Dunn, human resource manager in Pineville, and his assistant started computing the employees' severance benefits using the 1987 policy. These calculations were approved by Glenn Breitwieser, vice president for manufacturing, and forwarded to Keegan in Illinois. On February 14, 1991, Keegan called Breitwieser and told him that the benefits had been calculated under the wrong plan. In the conference call that followed, Breitwieser, Dunn, and Biggers all disputed the existence of a 1989 policy. Nevertheless all benefits were recomputed under the 1989 policy as communicated during the conference call.
 
 
 9
 In addition to closing the Pineville plant, Wittek Industries was reorganizing in Illinois, laying off employees, and moving its offices from LaGrange Park, Illinois, to Galesburg, Illinois. In January 1991, Husch, who was still in LaGrange Park, began calculating severance benefits for the Illinois employees using the 1987 policy. Keegan, who had already moved to Galesburg, directed her to use the 1989 policy and mailed her a copy of the policy signed by Viana, which Husch received on February 18, 1991, after the Pineville plant had closed. She then sent it by fax to Pineville on February 21, 1991. Husch testified that the signed copy of the policy that she received had been retyped by someone else with a different typewriter and that, although the text was the same, it had been assigned a number different from that placed on the severance policy that she had typed in 1989. While Wittek Industries provided no explanation for the retyped copy, Keegan testified that the 1989 policy had been adopted when originally typed and that copies of the policy had been forwarded to Viana's secretary to be sent to Wittek Industries' various plants.
 
 
 10
 The district court rejected Keegan's testimony as incredible and found that "there is no credible evidence that Wittek Industries adopted written changes to its 1987 severance pay policy prior to the closing of the [Pineville] plant." The court therefore found that the 1987 plan applied at the time the employees were laid off, and awarded benefits as provided by it.
 
 
 11
 On appeal Wittek Industries contends that the district court was clearly erroneous in finding that the policy in effect at the time the employees were terminated was the 1987 policy, and further that any lack of notice to the employees about the new policy is irrelevant as notice is not a condition to the policy's effectiveness. It argues,
 
 
 12
 the only notice requirement even arguably applicable would be pursuant to ERISA Sec. 104(b)(1) [29 U.S.C. Sec. 1024(b)(1) ] which provides that modifications or amendments to employee welfare benefit plans may be distributed to plan beneficiaries as much as 210 days after the plan year in which the change is adopted.
 
 
 13
 Our review of the record confirms that the district court's factual findings are clearly supported by substantial evidence. The district court was confronted with two opposing positions, each supported by testimony. The court credited the testimony supporting one of these positions and found facts consistent with this decision. Accordingly, we conclude that the findings are not clearly erroneous. The contention remains, however, that Wittek Industries may nevertheless rely on a duly adopted plan sent to its employees even after its termination of their employment.
 
 
 14
 A plan established by an employer providing for severance pay benefits is an employee welfare benefit plan covered by ERISA. However, because a welfare benefit plan is not subject to ERISA's vesting provisions, an employer is free to amend the terms of the plan or terminate it entirely. See Sejman v. Warner-Lambert Co., 889 F.2d 1346, 1348-49 (4th Cir.1989), cert. denied, 498 U.S. 810, 111 S.Ct. 43, 112 L.Ed.2d 19 (1990). Wittek Industries was thus under no obligation to continue the 1987 policy and could amend it based on Viana's determination that its benefits were too generous given the financial condition of the company. Id. at 1349. Every employee benefit plan covered by ERISA, however, must be established pursuant to a written instrument, with procedures outlined for amending the plan and identifying those with authority to make amendments. See 29 U.S.C. Sec. 1102(a)(1), (b)(3). A written plan is critical to ERISA's goal that employees be informed about the benefits to which they are entitled. Oral or informal written amendments are inadequate to alter the written terms of a plan, as this practice would undermine certainty. See Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 58-59 (4th Cir.1992), cert. denied --- U.S. ----, 113 S.Ct. 1051, 122 L.Ed.2d 359 (1993). Thus, we must look to the original 1987 policy to determine whether Wittek Industries effectively amended it in 1989. Only if an amendment has been made need we consider whether proper notice has been provided.
 
 
 15
 The 1987 policy of Wittek Industries does not, however, provide amendment procedures or designate persons authorized to amend it. We are therefore left with an employee welfare benefit plan that, although it may be terminated or amended, provides no mechanism or standard for doing so, as required by 29 U.S.C. Sec. 1102(b)(3). Biggers and the other employees have not argued that Wittek Industries' failure to provide the required procedures affects the company's ability to amend the plan. And in the circumstances we do not hold that the plan cannot be amended. Cf. Adams v. Avondale Industries, Inc., 905 F.2d 943, 949 (6th Cir.) (concluding that a failure to provide procedures for amendment does not render a plan unamendable, but may prevent a specific amendment from taking effect if the employees can show detrimental reliance), cert. denied, 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990). Yet, we remain in need of a standard for considering whether the 1989 amendment was effectively adopted when it was drafted and filed but not approved and signed by Viana.
 
 
 16
 As is often the case in considering issues under ERISA, when they are not covered explicitly by the Act, we find guidance in the principles of trust law. See Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 110-11, 109 S.Ct. 948, 954-55, 103 L.Ed.2d 80 (1989) (noting in the context of determining the standard of review under ERISA for actions for benefits, "we are guided by principles of trust law"). A situation much like the one now before us occurs in trust law when a settlor reserves the power to modify or revoke a trust, but fails to specify a method for implementing changes. If such power is reserved, then the settlor may exercise the power in any manner that "sufficiently manifests his intention to modify the trust." Restatement (Second) of Trusts Sec. 331 cmt. c. The settlor must indicate that he has reached a "definitive decision" to alter the trust, and is not just contemplating taking some action in the future. Id. Sec. 330 cmt. i; see also Deibler v. United Food and Commercial Workers, Local Union 23, 973 F.2d 206, 210 (3rd Cir.1992) (relying on trust law principles and stating that a benefit plan may be amended only through manifestation of an intent to alter).
 
 
 17
 Because the power to revoke or amend an employee welfare benefit plan is inherently reserved to the employer under ERISA, an employer who fails to include procedures in its plan for amendment is in the same position as the settlor who has reserved the power to amend but not provided a method for exercising it. The trust law standard for determining whether an amendment has been made is thus appropriate for determining whether an employer has formally amended an employee welfare benefit plan covered by ERISA. Accordingly, we hold that in the absence of provisions in a plan that provide procedures for amendment, a writing amends a plan only when accompanied by a clear manifestation of an intent to alter the policy or plan.[1] A rule that would establish otherwise would expose companies to unpredictable consequences whenever they undertook a review of existing policies.
 
 
 18
 Here, the district court found that Wittek Industries undertook a process of revision in drafting its policies, instructing its director of human resources to carry out the task. Wittek Industries presented no evidence, however, that any new policy was actually adopted. The court found that the new policies were typed, but placed unsigned into a locked file cabinet. Moreover, Keegan, the company official who actually prepared the written policy, had a copy made for the president to look at, approve, and sign, clearly implying that only with the approval and signature of the president could the change become effective. Similarly, Keegan expressed frustration in his efforts to obtain Viana's signature on the policies. It thus appears uncontradicted that adoption of the plan could only occur upon the approval and signature of Wittek Industries' president. Critical to this issue, the court found that the 1989 policy for severance benefits was not in fact signed at the time the plant was closed on February 15, 1991.
 
 
 19
 While the facts found by the district court certainly indicate that alteration of the 1987 policy was contemplated, in the absence of evidence manifesting actual adoption of the new draft, Wittek Industries cannot contend it was in effect. The evidence that revisions were typed for approval, without evidence of approval in fact, falls short of proving manifestation of adoption of the new policy. In the absence of any showing that Wittek Industries had manifested an intent to actually adopt the 1989 policy as of the time the plant closed, we can find no error in the court's decision to apply the 1987 policy.
 
 II
 
 20
 Glenn Breitwieser, who had also been employed at the Pineville plant as its general manager, was promoted in May 1990 to vice president of manufacturing of Wittek Industries. In response to Viana's offer of the promotion, Breitwieser wrote,
 
 
 21
 As we discussed on April 24, 1990, I would consider accepting the Vice President of Manufacturing position at Wittek Industries with the following agreed to:
 
 
 22
 * * * * * *
 
 
 23
 (2) Letter of guarantee of severance protection for one year.
 
 
 24
 * * * * * *
 
 
 25
 If the above items are agreeable, please have Human Resources confirm with a letter.
 
 
 26
 Viana approved the conditions stated in Breitwieser's letter and Wittek Industries' director of human resources followed up with a letter responding to Breitwieser's severance protection condition, writing, "Letter of agreement regarding severance will be written with your input." Although Breitwieser later testified that he thought that a letter had been prepared and put into his personnel file, he conceded he was never provided with such a letter and one was never produced during discovery. Indeed, the testimony without contradiction shows that one was never prepared.
 
 
 27
 Because the relationship between Breitwieser and Wittek Industries was "not working," Breitwieser's employment was terminated in February 1991 when the Pineville plant was closed. Contending that his promotion to vice president included an agreement to pay one year's salary in the event of severance, Breitwieser sued Wittek Industries under the common law of Illinois for breach of contract. His claims were submitted to the jury, which was instructed on Illinois contract law, and the jury awarded him $99,187.50, his annual salary, in damages.
 
 
 28
 Wittek Industries contends that the district court erred in treating Breitwieser's claim for severance pay as one for breach of contract under Illinois common law. It asserts that the claim is one under an employee welfare benefit plan covered by ERISA and therefore should not have been submitted to the jury. See Berry v. Ciba-Geigy Corp., 761 F.2d 1003, 1007 (4th Cir.1985). In response, Breitwieser contends that his claim is based on an individual contract between him and Wittek Industries for services and therefore does not constitute a plan covered by ERISA.
 
 
 29
 We note initially that it is not altogether clear that Breitwieser's arrangement is an individual one and not part of the generally applicable 1987 policy. Paragraph 14 of the 1987 policy for severance benefits, which the district court found to have been in effect at the time the Pineville plant was closed, allows for just the individual arrangement advanced by Breitwieser. The paragraph provides:
 
 
 30
 In the event an Employment Contract is in force between the Company and a salaried employee, severance pay provisions of said contract will set aside provisions of this policy and be the controlling policy.
 
 
 31
 Therefore, even if an individual arrangement for severance pay had been reached, it would appear that it was by virtue of this policy. Either Breitwieser's circumstances fell under the policy's general provisions providing for severance pay in amounts stated in the policy or he reached an individual agreement within the contemplation of paragraph 14.
 
 
 32
 Even if we accept Breitwieser's characterization of his alleged agreement as a distinct arrangement covering only one employee, we nevertheless conclude that his claim for breach of that arrangement falls under ERISA.
 
 
 33
 It is beyond question that plans established by an employer to provide severance benefits are employee welfare benefit plans within the scope of ERISA. See Massachusetts v. Morash, 490 U.S. 107, 116, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989) ("plans to pay employees severance benefits, which are payable only upon termination of employment, are employee welfare benefits plans within the meaning of [ERISA]"); Holland v. Burlington Industries, Inc., 772 F.2d 1140, 1145-46 (4th Cir.1985), cert. denied, 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562, and aff'd. mem. sub nom. Brooks v. Burlington Industries, 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559 (1986). We are not aware of any requirement that a plan must cover more than one employee in order to be controlled by ERISA. Neither the definition of "employee welfare benefit plan" nor "employee benefit" includes any suggestion that the number of employees covered is a limiting factor. See 29 U.S.C. Sec. 1002(1), (3).[2] In addition, 29 C.F.R. Sec. 2510.3-1, promulgated to clarify what constitutes an employee welfare benefit plan, outlines a number of practices that do not constitute such a plan. While the list is not meant to be dispositive, we note that no language in this section gives any indication that a plan cannot be established to cover only one employee. In contrast, 29 C.F.R. Sec. 2510.3-3(b), concerning employee benefits plans in general, excludes from ERISA coverage plans with no employees, such as Keogh plans with only a sole proprietor or partners as participants. It provides further, however, that if one common law employee is a participant, then the plan is covered. See also Meredith v. Time Ins. Co., 980 F.2d 352, 356-57 (5th Cir.1993) (applying 29 C.F.R. Sec. 2510.3-3).
 
 
 34
 An opinion letter from the Department of Labor reinforces our interpretation that ERISA allows for the possibility of a single-employee plan. See U.S. Dep't. of Labor Opinion Letter No. 91-20 A (July 2, 1991). The Department concluded that an arrangement between a company and only one employee "appears to fall within the definition of 'employee benefit plan' in Section 3(3) of ERISA by virtue of being an 'employee welfare benefit plan' as defined in Section 3(1) of ERISA." Under the arrangement considered in the Opinion Letter, the company agreed as an inducement to persuade its employee to move across the country that, in the event of the employee's termination during the first three years of employment, the company would pay a severance amount equal to three times the employee's annual salary and a reduced amount after the first three years.
 
 
 35
 Breitwieser relies in part on Fraver v. North Carolina Farm Bureau Mutual Insurance Co., 801 F.2d 675 (4th Cir.1986), cert. denied, 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987), for the proposition that individual agreements do not fall under ERISA. While it is true that the arrangement involved there was an agreement between an insurance company and each of its independent insurance agents for the continued payment of renewal commissions after the agent's retirement, the opinion never addressed the question of whether such a plan is excluded from ERISA because it only involves one employee. Rather, the case concerned primarily whether a pension plan had been established, and held that an arrangement for the deferred payment of insurance commissions was not retirement income but rather direct compensation for actual business generated earlier by the agent. Because direct compensation, not retirement income, was found to be involved, the plan was not covered under ERISA. See Morash, 490 U.S. at 117, 109 S.Ct. at 1674 (making the distinction between benefit arrangements and "regular compensation" and noting that ERISA does not regulate the latter).
 
 
 36
 We conclude that Breitwieser's claim is for a benefit under an employee welfare benefit plan covered by ERISA. Because ERISA preempts his common law contract claim, his claim should have been tried by the court under the principles of ERISA, rather than before the jury under Illinois contract law.
 
 III
 
 37
 Finally, Wittek Industries challenges the court's entry of an order awarding attorney's fees, pursuant to 29 U.S.C. Sec. 1132(g)(1), to the plaintiffs below. It contends principally that it was not given the opportunity to respond to plaintiffs' motion for an award of attorney's fees and to question whether the criteria for awarding attorney's fees that we have outlined in our cases were present. See, e.g., Quesinberry v. Life Ins. Co. of North America, 987 F.2d 1017, 1028-30 (4th Cir.1993) (en banc). After awarding attorney's fees in favor of the plaintiffs below and after Wittek Industries filed its notice of appeal, the district court purported to vacate its order, stating, "the court, in its zeal to act promptly on motions, inadvertently acted too promptly in this matter and did not allow defendant's counsel an opportunity to respond." No further proceedings have taken place following the district court's order. In view of the circumstances and the timing of the district court's order purporting to vacate its attorney's fee award, we vacate the order awarding attorney's fees entered before the notice of appeal and remand that issue for further proceedings.
 
 IV
 
 38
 In summary, we affirm the award of severance pay made under the 1987 policy to Biggers and the other 17 former employees of Wittek Industries. We vacate the award of severance pay to Breitwieser and remand that case for trial before the court under the provisions of ERISA. Finally, we vacate the district court's award of attorney's fees and remand that issue for further proceedings.
 
 
 39
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.
 
 
 
 [1]
 While we hold that in the circumstances of this case an employer may amend a plan despite its failure to incorporate procedures for amendment as required by 29 U.S.C. Sec. 1102(b)(3), we point out that the inclusion of such procedures is statutorily required. Not only may the requirement be enforced by suit brought under 29 U.S.C. Sec. 1132, but the failure to include the mandated procedures may, in other circumstances, affect the enforceability of an amendment. See Adams, 905 F.2d at 949
 
 
 [2]
 An employee welfare benefit plan is defined as:
 any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).
 29 U.S.C. Sec. 1002(1).
 The term employee benefit plan means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee benefit plan and an employee pension benefit plan.
 Id. Sec. 1002(3).