Kenneth JORDAN, et al., Plaintiffs,

v.

E.I. DU PONT DE NEMOURS & COMPANY, Defendant.

Civ. A. No. 1:91–3569–22.

United States District Court,
D. South Carolina,
Aiken Division.

Sept. 30, 1994.

Thomas D. Broadwater, Sr., Columbia, SC, for plaintiffs.

Gardner G. Courson, Allen W. Groves, Atlanta, GA, Richard J. Morgan, Columbia, SC, for defendant.

**ORDER**

CURRIE, District Judge.

## I. Procedural Background

Plaintiffs filed this action in state court on October 18, 1991. Plaintiffs sought recovery of severance benefits from Defendant E.I. du Pont de Nemours & Company ("du Pont") under various state and federal causes of action. Although the action is styled as a class action, the Complaint appears to name all individual members of the proposed class. On November 22, 1991, du Pont removed the action to this court based upon federal question jurisdiction.

After the close of discovery, du Pont filed a motion for summary judgment, arguing that Plaintiffs' claims were completely preempted by the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA") and that, as a matter of law, Plaintiffs could not recover under ERISA. Plaintiffs filed a cross-motion for summary judgment, asserting that they were entitled to recover severance benefits under South Carolina common law governing implied, unilateral contracts. On April 20, 1994, the court held a hearing on the motions for summary judgment. At the conclusion of the hearing, the court denied Plaintiffs' cross-motion for summary judgment and partially granted du Pont's motion, finding that Plaintiffs' claims were completely preempted by ERISA.

The court identified the sole remaining issue to be determined at the summary judgment stage as follows:

> Whether du Pont's severance benefit plan was effectively amended on or before March 31, 1989, such that Plaintiffs were entitled to receive severance benefits under the severance benefit plan at the time of the termination of their employment with du Pont on March 31, 1989?

The court then ordered the parties to prepare a set of stipulated facts and briefs on the issue.

## II. Factual Background

The following factual background is based on the stipulated undisputed facts agreed to by the parties pursuant to the court's order.

1. Du Pont constructed and operated the Savannah River Site for the United States Department of Energy ("DOE") from 1950 until March 31, 1989. The construction of the Site was the responsibility of the Construction Division of du Pont's Engineering Department, while the operation of the Site was the responsibility of du Pont's Petrochemicals Department. [Ex. 29; Ex. 38, p. 25.]

2. The Savannah River Construction Division of du Pont's Engineering Department was often referred to in Company documents and publications by the initials "SRC." [Ex. 14; Ex. 39, pp. 63, 89, 97–98.] The operations department of du Pont's Petrochemicals Department at the Site was often referred to in Company documents and publications by the Initials "SRP." [Ex. 22; Ex. 39, pp. 63, 66–67, 89, 96.] The laboratory department of du Pont's Petrochemicals Department at the Site was often referred to in Company documents and publications as "SRL." [Ex. 22; Ex. 39, pp. 39, 96–97.]

3. SRP/SRL and SRC had totally separate lines of supervision, through and including the vice presidential level at the Company's Wilmington, Delaware, corporate headquarters. [Ex. 29, pp. 62, 233–234; Ex. 8, pp. 29–34, 36–37; Ex. 39, pp. 24–26, 33, 35–37, 56, 61, 76, 89.] During the relevant period for purposes of this action, Charles Brown was vice president of du Pont's Engineering Department [Ex. 39, p. 90]; Bud Hartnett and, subsequently, Bob Wooten, reported to Mr. Brown in their capacity as manager of the Engineering Department's Savannah River Construction Division, and were the division's senior manager during respective tenures at the Site. [Ex. 8, pp. 12, 19; Ex. 21; Ex. 39, p. 89; Ex. 38, pp. 77–78.] E.F. Ruppe was vice president of du Pont's Petrochemicals Department during the relevant period [Ex. 17; Ex. 39, pp. 56–57]; J.T. Granaghan and, subsequently, J.T. Lowe, reported to Mr. Ruppe in their capacity as plant manager of the Petrochemicals Division's Savannah River Plant operations, and were that division's senior manager during their respective tenures at the Site. [Ex. 5; Ex. 8, pp. 36–37; Ex. 29, p. 254; Ex. 15; Ex.

17–18; Ex. 22; Ex. 38, pp. 76–78; Ex. 39, pp. 89, 96.]

4. Manual craft wage roll employees in du Pont Engineering's Savannah River Construction Division were those employees who performed craft work in one or more of the fourteen AFL/CIO building trades. These employees were paid on an hourly basis, and their compensation was set according to their respective union memoranda of understanding and site stabilization agreements with du Pont SRC. Plaintiffs were at all times relevant to this action employed as manual craft wage roll employees in the SRC Division of du Pont's Engineering Department, and were members of, and represented by, various building trades unions for purposes of collective bargaining with du Pont SRC. [Ex. 37, ¶ 6; Ex. 35–36, Admission # 6; Ex. 38, pp. 80–81.]

### ESTABLISHMENT AND TERMS OF DU PONT'S SEVERANCE PAY PLAN

5. On January 4, 1956, du Pont's Executive Committee established a severance pay policy for the Company. The severance policy as adopted gave each "employment point" express discretion to choose in what manner it would adopt and implement severance pay, and also what procedures would be developed for determining eligibility for receipt of severance pay. [Ex. 2.]

6. On February 1, 1956, and pursuant to the du Pont Executive Committee's aforementioned directive, the du Pont Engineering Department adopted a severance pay procedure for employees in its Construction Division. According to this modified severance procedure, all manual craft wage roll employees at Savannah River were excluded from receiving severance benefits. [Ex. 3; Ex. 39, p. 77.]

7. Application of this severance procedure to du Pont SRC manual craft wage roll employees was expressly reaffirmed by the Construction Division manager on February 25, 1972. [Ex. 4; Ex. 39, pp. 23–23, 87.]

8. Plaintiffs' named representative in this action was laid off for lack of work from manual craft wage roll positions with du Pont SRC on at least four separate occasions dur-

ing his employment, and did not receive severance pay on any of these occasions. [Ex. 38, pp. 23–27; Ex. 29, p. 85.] None of the identified Plaintiffs ever received severance pay as a result of any number of layoffs from du Pont SRC prior to March 1989. [Ex. 38, p. 53; Ex. 35–36, Admissions #1 & #2.]

### THE 1985 AMENDMENTS TO DU PONT'S SEVERANCE PAY PLAN

9. Effective October 1, 1985, du Pont's Executive Committee amended the definition of "lack of work" for purposes of the Company severance polity. Under the plan as amended, "lack of work" triggering severance pay no longer included those situations where du Pont was replaced by another contractor which hired former du Pont employees at no loss of pay, benefits or work. However, all Company service accrued prior to September 30, 1985, was "grandfathered" under the 1985 plan amendments, which meant that such service was credited towards computation of severance pay to be paid to all du Pont employees who were otherwise eligible for severance benefits as of the date of any termination of operations at Savannah River by du Pont. [Ex. 5–6; Ex. 9, "severance"; Ex. 39, pp. 16–28.] No subsequent changes to the severance plan were established by the Executive Committee between 1985 and 1989.

10. On December 18, 1984, all du Pont Petrochemicals SRP employees were notified of these amendments to du Pont's benefits plans in a memorandum for J.T. Granaghan, plant manager, address "SAVANNAH RIVER PLANT [—] TO ALL EMPLOYEES." [Ex. 5.] This memorandum discussed changes to du Pont's medical, group life and severance benefit plans, and was not distributed to any du Pont Engineering SRC Division employees.

11. On January 18, 1985, a memorandum was prepared and distributed by C.M. Sudler, du Pont Savannah River Construction employee relations specialist, addressed "TO ALL DU PONT CONSTRUCTION EMPLOYEES (NON–MANUALS)" concerning two benefit plan changes applicable to "lack of work" terminations occurring on or after July 1, 1984, as well as the aforementioned change in severance pay effective October 1, 1985. [Ex. 6.] This memorandum was not distributed to SRC manual craft employees.

12. A second memorandum, also dated January 28, 1985, from Mr. Sudler, was prepared and distributed to "ALL DU PONT CONSTRUCTION EMPLOYEES (MANUAL)" regarding "BENEFIT PLAN CHANGES—LACK OF WORK TERMINATIONS." [Ex. 7.] This memorandum was sent to the class of SRC employees at the Site which included Plaintiffs, and contained no reference to severance pay or the changes thereto effective October 1, 1985. Plaintiffs' named representative received a copy of this memorandum in January 1985. [Ex. 38, pp. 95–96.]

### DU PONT'S SUMMARY PLAN DESCRIPTION

13. On or about September 11, 1987, du Pont distributed binders entitled "Your Du Pont Benefits Resources" to Savannah River employees, which contained summary descriptions of the various employee benefits for which certain employees were eligible. [Ex. 9.] The benefits binders distributed to non-manual Engineering Department employees, as well as to those employed in positions in the Petrochemicals Department, contained a specific section providing a detailed summary of du Pont's "Severance Pay Policy," identified as "[t]he formal name of the plan." In this section, under the sub-heading "Future of the Plan," the summary plan description included the statement that "While du Pont intends to continue the benefits and policies described in this booklet, the Company reserves the right to change, modify or discontinue this policy at its discretion." [Ex. 9.]

14. Under the sub-heading "Who Is Eligible," the du Pont Severance Pay Policy summary plan description stated that "You're eligible for benefits under the Severance Pay Policy if you're a full service employee and you're terminated for lack of work after you've had at least one year of service with du Pont or one of its subsidiaries that has adopted this policy." [Ex. 9.]

15. On or about September 11, 1987, a second, modified set of benefits binders were

prepared and distributed to SRC manual craft employees, including Plaintiffs. [Ex. 10; Ex. 37, ¶ 9; Ex. 39, pp. 92–93.] These binders were specifically stamped "for Savannah River Construction Wage Roll Employees" on the cover and on each benefit divider (in black ink on green stock), and were distributed with a cover letter addressed to "All Du Pont E.D.—A.E.D. Manual Employees" from G.B. Ford, the equal employment and employee benefits officer for du Pont SRC. [Ex. 12; Ex. 38, pp. 87–88.] The abbreviation "E.D.—A.E.D." referred to du Pont's Engineering Department—Atomic Energy Division, which was formed when du Pont began work at the Savannah River Site. [Ex. 29, p. 233.] All du Pont SRC Division employees at the Site, including Plaintiffs, were part of the Engineering Department's Atomic Energy Division. [Ex. 38, pp. 87–88.]

16. Ms. Ford's memorandum, which was prepared for hourly manual craft employees including Plaintiffs, stated that the benefits binders were being distributed as a matter of information to employees, and that any questions employees might have regarding specific benefits should be handled through line supervision and du Pont SRC's Employee Benefits Department. [Ex. 12.] Plaintiffs' named representative in this action received the SRC manual crafts benefits binder and the memorandum from Ms. Ford in September 1987, and has testified that this benefits binder contained a description of the full range of benefits available to SRC manual craft employees as of the date of issue. [Ex. 38, pp. 87, 91, 106.]

17. The benefit binders distributed to SRC manual craft wage roll employees did not contain a section on severance pay, nor was severance pay mentioned anywhere in the summary plan descriptions provided in the binders. [Ex. 10; Ex. 37, ¶ 9; Ex. 38, p. 93; Ex. 39, pp. 92–93.]

## DU PONT'S COMMUNICATIONS WITH EMPLOYEES REGARDING THE COMPANY'S CESSATION OF OPERATIONS AT THE SAVANNAH RIVER SITE

18. Du Pont operated the Savannah River Site pursuant to a "pass through" contract with the United States Department of Energy, the most recent version of which covered the period 1984 to 1989. Under the terms of this contract, DOE agreed to reimburse du Pont for all operating expenses incurred by the Company in constructing, operating and maintaining the Site. The contract did not set the specific employee benefits reimbursable under its provisions, but rather limited reimbursable benefits under the contract to those paid out pursuant to "all welfare and employee relations plans and policies of the contractor, insofar as the same are applied to the work performed under this contract, or . . . pursuant to agreements made as a result of collective bargaining with representatives of employees." Du Pont was only permitted to seek reimbursement of those employee benefits to which Savannah River employees were eligible under the terms of regular Company policies and procedures. [Ex. 1.]

19. In October 1987, du Pont advised the Department of Energy that the Company did not wish to operate Savannah River beyond the contract period, and would not seek renewal of its Site operating contract with DOE after the expiration of the last five year agreement signed in 1985. [Ex. 13.]

20. In anticipation of employee questions regarding the effects of du Pont's pending departure from the Savannah River Site, du Pont established a transition team to address employee questions. [Ex. 39, p. 80.] As part of this transition process, retired du Pont employees were set up in offices on Site to answer employee questions regarding benefits. [Ex. 39, p. 80.]

21. In addition, on or about November 1987, du Pont SRC Division's human resources department issued a document entitled "BENEFIT QUESTIONS RE: CONTRACT NON RENEWAL," which was addressed to "ALL SRC DUPONT ROLLS." [Ex. 14; Ex. 39, pp. 42–43, 50–54.] This document, provided to all SRC foremen for review with SRC employees, including those in manual crafts [Ex. 39, p. 52], contained a series of questions and answers regarding the effect on SRC employee benefits of du

Pont's planned 1989 termination of operations at the Site. Plaintiffs' named representative recalls seeing a copy of this document at the time it was distributed and "put out on [the] plant site." [Ex. 38, p. 85.] SRC manual craft supervisors were also instructed by the du Pont transition team to respond to all questions regarding severance pay by stating that SRC manual craft employees were not eligible for that benefit. [Ex. 39, p. 100.]

22. Several of the questions and answers included in this document concerned the issue of severance pay. Question I(1)(a) asked "Will 1– and 2–employees get severance pay?" the response to which was "Yes, if service and eligibility requirements are met." [Ex. 14.] The term "1–employees" referred to certain exempt supervisors and engineers employed by SRC; the term "2–employees" referred to non-exempt clerical and technical employees with SRC. [Ex. 39, pp. 101–102.] No Plaintiffs were employed in 1– or 2– classifications during the relevant period. [Ex. 38, p. 86.]

23. Question I(1)(b) contained in the November 1987 "Q & A" document asked "Will manual employees get severance pay?", the response to which was "No. Manual employees are not eligible." [Ex. 14.] Question I(7) asked "If offered a job with contractor of lower compensation or position will employee get severance pay?" the response to which was, in pertinent part, "Yes, if non-manual roll." [Ex. 14.]

24. Shortly after du Pont's announcement that it would leave the Site in 1989, several articles appeared in local newspapers regarding du Pont's decision. This local press coverage included one or more editorials in *The Augusta Chronicle*, in which the newspaper's editors criticized du Pont's intention to seek reimbursement from the Department of Energy of any severance payments to employees which the Company might make at the time cessation of its Savannah River operations in March 1989. [Referenced in Ex. 17–18.]

25. On April 28, 1988, J.T. Granaghan, du Pont Petrochemicals SRP manager, issued a memorandum addressed "TO SAVANNAH RIVER PLANT AND LABORATORY EMPLOYEES," in which Mr. Granaghan responded to published articles regarding du Pont's severance pay policy. [Ex. 15.]

26. On May 25, 2988, in response to continued editorial criticism of du Pont's intention to pay severance benefits according to established policy and to seek reimbursement of severance pay from DOE, E.F. Ruppe, du Pont Petrochemicals Department vice president, wrote to Philip Kent, editorial page editor of *The Augusta Chronicle*, indicating du Pont's disagreement with the newspaper's stated position regarding the reimbursement issue. [Ex. 16–17.]

27. On May 31, 1988, after *The Augusta Chronicle* printed an edited version of Mr. Ruppe's letter to the editor [Ex. 16], Mr. Granaghan, SRP manager, and J.T. Lowe, du Pont Petrochemicals SRL director, issued a memorandum addressed "TO SAVANNAH RIVER PLANT AND LABORATORY EMPLOYEES" [Ex. 17], attaching a full-text copy of Mr. Ruppe's May 25, 1988, letter to the editor. [Ex. 17.]

28. On August 24, 1988, and in direct response to a decision by the Secretary of Energy that the U.S. Government would not reimburse du Pont for severance payments to du Pont employees, Mr. Granaghan, SRP manager, released a memorandum addressed "SAVANNAH RIVER PLANT [—] TO ALL EMPLOYEES," in which Mr. Granaghan "reaffirm[ed]" du Pont's position regarding severance pay and the Company's intention to seek reimbursement of severance pay from DOE. [Ex. 18.]

29. As late as January 1, 1989, published newspaper reports in *The Augusta Chronicle* detailed the fact that severance pay was not among the benefits to which SRC manual craft employees were eligible under du Pont's benefit plans. [Ex. 20.] Another report published in the December 9, 1988, edition of *The Augusta Chronicle* specifically referred to the fact that du Pont provided benefits to SRC manual craft employees which were "different" from those provided to other du Pont employees at the Site. [Ex. 19.]

30. On March 27, 1989, Mr. Lowe, Mr. Granaghan's successor as du Pont Petrochemicals SRP manager, and D.L. McIntosh,

Mr. Lowe's successor as du Pont Petrochemicals SRL director, issued a memorandum addressed "ALL SRP AND SRL EMPLOYEES" and entitled "SEVERANCE PAY" [Ex. 22], to which they attached a letter dated March 22, 1989, from R.E. Heckert, du Pont chairman. [Ex. 22.] Dr. Heckert's letter, addressed "TO DUPONT EMPLOYEES," summarized du Pont's position regarding severance benefits and the Department of Energy's obligation to reimburse any such benefits paid by du Pont.

31. At no time did any manager in du Pont's Engineering Department, including the SRC Division, issue or publish any statement that SRC manual craft employees would receive, or be eligible for, severance benefits under the du Pont severance pay policy, or indicate that the severance pay policy had been amended to include SRC manual craft employees. [Ex. 39, pp. 90–91.]

32. On March 31, 1989, du Pont paid severance benefits, based on all accrued Company service prior to 1985, to those du Pont Savannah River employees whom the Company determined were eligible to receive severance pay under its interpretation of the du Pont severance pay policy, and the Construction Division's modified severance procedure. No severance benefits were paid to any employees in SRC manual craft wage roll positions as of March 31, 1989, which classification included Plaintiffs. [Ex. 37, ¶ 11; Ex. 35–36, Admission # 3; Ex. 39, pp. 86, 93–94.] However, severance benefits were paid to those employees who had accrued their full du Pont service credit in SRC manual craft positions on or prior to 1985, but who were not in SRC manual craft positions as of the date of du Pont's termination of operations at the Site. [See Affidavits of former du Pont employees, attached to Plaintiffs' Complaint.]

33. Du Pont subsequently claimed reimbursement of these severance benefits paid to SRP, SRL and eligible SRC employees, pursuant to its contract with the Department of Energy. Du Pont has never made any demand for funds from the Department of Energy relating to severance benefits for that class of manual-craft SRC employees which includes Plaintiffs. [Ex. 39, pp. 87, 94.]

### PLAINTIFFS' SUBSEQUENT EMPLOYMENT WITH BECHTEL SAVANNAH RIVER COMPANY, INC.

34. Sometime after du Pont's 1987 announcement that it would cease operations at the Savannah River Site in 1989, the Department of Energy announced that beginning on April 1, 1989, Westinghouse Savannah River Company, Inc. (hereinafter "WSRC") and Bechtel Savannah River, Inc. (hereinafter "Bechtel") would replace du Pont as operations and construction contractors, respectively, at the Site. [Ex. 19–21.]

35. At the time of the cessation of du Pont's operating presence at the Savannah River Site on March 31, 1989, Plaintiffs were offered manual craft wage roll positions with Bechtel. This offer included continuation of the exact same employee benefits as the Plaintiffs had enjoyed while employed by du Pont SRC (termed "Du Pont Amended Benefits"). [Ex. 21; Ex. 23; Ex. 38, pp. 100–102.] Du Pont's departure from the Site resulted in no loss of work, compensation, benefits or seniority rights for Plaintiffs. [Ex. 38, pp. 139–140.]

36. The Bechtel employee benefit handbook, which was provided to manual craft employees who opted to accept employment with Bechtel while continuing their du Pont benefits, contained no reference to severance pay as a benefit to which those employees were eligible, nor have any manual craft wage roll employees in fact received severance pay as a benefit with Bechtel. [Ex. 23; Ex. 38, pp. 102–103.] The benefit handbook provided to non-manual employees of Bechtel and WSRC contained an express reference to severance pay, which is a benefit non-manual employees are eligible to receive with Bechtel and Westinghouse. [Ex. 24.]

### PLAINTIFFS' POST–TERMINATION DEMANDS FOR SEVERANCE BENEFITS AND DU PONT'S RESPONSES

37. On March 30, 1989, Kenneth Jordan, Plaintiffs' named representative, wrote to Dr. Heckert, du Pont chairman, inquiring why Plaintiffs had not, and would not, receive severance pay from du Pont when the Com-

pany ceased operations at Savannah River on March 31, 1989. [Ex. 38, p. 49.]

38. On May 4, 1989 Lawton A. Burrows of du Pont's legal department replied to Mr. Jordan, stating that under du Pont's severance pay plan, "SRC crafts have never been eligible for severance pay." [Ex. 26.]

39. Sometime prior to April 26, 1989, Plaintiffs' counsel contacted Mr. Burrows by telephone to discuss the demand by certain SRC manual craft wage roll employees for severance pay. By letter dated April 16, 1989, Mr. Burrows detailed the reasons why these employees were not eligible to receive severance pay, attaching several documents which supported du Pont's position in this regard. [Ex. 25.]

40. On October 7, 1989, Plaintiffs' counsel again wrote to Dr. Heckert regarding Plaintiffs' demand for du Pont severance benefits. [Ex. 27.]

41. On October 20, 1989, Mr. Burrows responded, once again detailing the basis for du Pont's determination that Plaintiffs were not eligible to receive severance pay under the du Pont severance pay policy and procedures. [Ex. 28.]

42. On October 18, 1991, Plaintiffs filed the instant civil action, seeking an award of severance benefits under du Pont's severance benefit plan.

### III. Summary Judgment Standard

In deciding a summary judgment motion, the court must look beyond the pleadings and determine whether there is a genuine need for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The court must determine "whether the evidence presents a sufficient disagreement to require submission to the fact finder or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–53, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). If Defendant carries the burden of showing there is an absence of evidence to support a claim, then Plaintiffs must demonstrate by evidence of record that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106

S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). An issue of fact is "genuine" if the evidence is such that a reasonable fact finder could return a verdict for Plaintiffs. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. An issue of fact concerns "material" facts only if establishment of the fact might affect the outcome of the lawsuit under governing substantive law. *Id.* A complete failure of proof concerning an essential element of Plaintiffs' case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552. Moreover, production of a "mere scintilla of evidence" in support of an essential element will not forestall summary judgment. *Anderson*, 477 U.S. at 251, 106 S.Ct. at 2511.

In other words, summary judgment should be granted in those cases in which it is perfectly clear that no genuine issue of material fact remains unresolved and inquiry into the facts is unnecessary to clarify the application of the law. *McKinney v. Bd. of Trustees*, 955 F.2d 924, 928 (4th Cir.1992); *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979). With these standards in mind, the court now focuses its attention on whether summary judgment is appropriate for Plaintiffs' claim under ERISA.

### IV. Analysis

Plaintiffs essentially make five arguments in support of their claims for severance benefits from du Pont. First, Plaintiffs contend that a March 22, 1989, letter from du Pont Chairman R.E. Heckert constituted a "summary plan description" under ERISA which entitled Plaintiffs to severance benefits. Second, they claim that the March 22, 1989, letter constituted a unilateral contract which was enforceable against du Pont under South Carolina law governing implied, unilateral employment contracts. Third, Plaintiffs assert that they relied upon the March 22, 1989, letter to their detriment and that they are entitled to severance benefits under a federal common law theory of equitable estoppel. Fourth, Plaintiffs claim that the original 1950 Savannah River Site "interim" letter contract between du Pont and the United States Government created an obligation to pay severance benefits to all Savannah River Site employees and that no effort

was made to notify Plaintiffs in writing that du Pont's severance plan was amended to exclude them from eligibility. Finally, Plaintiffs rely upon various communications from du Pont Petrochemicals officials as the basis for their entitlement to severance benefits. For the reasons discussed below, the court finds these arguments to be without merit and grants summary judgment in favor of du Pont.

■ The present controversy centers around the du Pont severance benefit plan, identified in formal plan documents as the "du Pont Severance Pay Policy." [Stip. 13.] Plaintiffs concede in their brief they were aware that they were not eligible for severance benefits under the terms of the du Pont severance plan as late as March 22, 1989. [Plaintiffs' Brief, at 1.] This admission is consistent with the undisputed facts in this case which show that at the time the severance plan was originally adopted, du Pont Savannah River Construction ("SRC") manual craft employees were expressly identified in plan documents as ineligible for severance benefits. [Stips. 5–7, 12, 15–17, 21, 23.] Plaintiffs, however, contend that a March 22, 1989, letter from du Pont Chairman R.E. Heckert was an effective modification of the du Pont severance plan and made Plaintiffs eligible for receipt for severance pay after that date. The court finds this contention to be without merit.

The du Pont severance plan was originally adopted by formal action of the du Pont Executive Committee on January 4, 1956. [Stip. 5.] The du Pont Executive Committee modified the severance plan relating to the method for determining "lack of work" by formal action, as well. [Stip. 9.] No formal action, however, was taken by the Executive Committee in 1989 to modify the severance plan to alter Plaintiffs' status as severance-ineligible SRC manual craft employees. [Stip. 9.] Therefore, it is clear that no formal action was ever taken by the Executive Committee to amend the severance plan according to prior procedures and that no enforceable amendment to the plan occurred. *See Biggers v. Wittek Industries, Inc.*, 4 F.3d 291, 295 (4th Cir.1993) ("Informal written amendments are inadequate to alter the written terms of a plan").

In its original action establishing the du Pont severance plan, the Executive Committee provided that each "employment point" had express discretion to determine the manner in which it would implement the plan. [Stip. 5.]. In accordance with this provision, the Engineering Department adopted a severance pay procedure for its Construction Division. Under the express terms of this procedure, all manual craft employees were excluded from eligibility for severance benefits. [Stip. 6.] This provision was reaffirmed by the Construction Division manager on February 25, 1972. [Stip. 7.] The stipulated facts establish that no subsequent modifications were made to the severance pay procedure by the Construction Division. Plaintiffs have identified nothing to indicate that the Construction Division amended the severance pay procedure to change Plaintiffs' status so that they were eligible for severance pay.

Plaintiffs also contend that the March 22, 1989, letter "carried the equivalency of a Summary Plan Description (SPD)" entitling Plaintiffs to receive severance pay under the du Pont plan. [Plaintiffs' Brief, at 1–2.] This assertion is also without merit.

■ The letter could not amend the plan in the absence of a formal amendment of the plan according to the terms of the plan instrument. *See Biggers*, 4 F.3d at 295. The letter was not distributed to Plaintiffs. It was drafted in response to media reports critical of du Pont's intention to honor existing severance plan commitments to severance-eligible employees. It was distributed only to severance-eligible employees in du Pont's Petrochemical Division at the Savannah River site, which included Savannah River Plant ("SRP") and Savannah River Labs ("SRL") employees, and had a one-page cover memo indicating it was being sent "TO ALL SRP AND SRL EMPLOYEES," [Stip. 30.] The stipulated facts make clear that the Petrochemicals Department's SRP and SRL operations at the Site were separate from the Engineering Department's SRC operations, in which Plaintiffs were employed. [Stips. 1–4.] Plaintiffs admit in their brief that the letter was not actually distributed to them,

but that they discovered its contents because the letter "was left around for your Plaintiffs to review." [Plaintiffs' Brief, at 1.] Given the fact that a summary plan description ("SPD") already existed for the severance plan, [Stips. 13–17], it is obvious that a two-page letter could not be deemed to be a second "free-standing" SPD.

Furthermore, Plaintiffs assertion that the March 22, 1989, letter is a SPD is contrary to Fourth Circuit caselaw. In *Elmore v. Cone Mills Corp.*, 23 F.3d 855, 860–61 (4th Cir. 1994) (en banc), the court was faced with the issue whether a promise to provide benefits contained in a letter to salaried employees from a company's chief executive officer was sufficient to amend a written plan. In reversing the district court, the Fourth Circuit held that the letter was insufficient and noted that:

> Under ERISA, plan fiduciaries must provide benefits only "in accordance with the *documents* and *instruments* governing" the employee pension benefit plan. 29 U.S.C.A. § 1104(a)(1)(D) (emphasis added); *see also Dzinglski v. Weirton Steel Corp.*, 875 F.2d 1075, 1080 (4th Cir.) ("To adhere to the plan is not a breach of fiduciary duty."), *cert. denied*, 493 U.S. 919, 110 S.Ct. 281, 107 L.Ed.2d 261 (1989). It is undisputed that the surplus representation was not incorporated into the written terms of the 1983 ESOP plan documents adopted by Defendants on April 2, 1984. Instead, the actual plan documents only mandated that Cone Mills provide benefits under the 10%/10%/1% formula.
>
> Nonetheless, the district court found that an employer representation not contained in the formal plan documents could become a part of the plan if the promise to provide benefits was contained in a written, formal, authorized, and ratified statement sent by the employer's CEO to all of the employer's salaried employees. In reaching its conclusion, the district court applied the inverse logic of our holding in *Pizlo v. Bethlehem Steel Corp.*, 884 F.2d 116 (4th Cir.1989). In *Pizlo*, we held that a plaintiff does not have a cause of action for benefits under ERISA when such benefits were promised in informal and unau-

thorized amendments to the benefit plan. *Id.* at 120. We did not state, however, that employees are entitled to recover benefits under *any* written statement made by a company official, even if authorized and ratified.

> On the contrary, only representations adopted in accordance with the amendment procedures outlined in the formal plan documents will suffice to incorporate the promised benefits into the plan. *Miller v. Coastal Corp.*, 978 F.2d 622, 624 (10th Cir.1992), cert. denied, —— U.S. ——, 113 S.Ct. 1586, 123 L.Ed.2d 152 (1993).

*Elmore*, 23 F.3d at 860–61 (footnote omitted).

There is no evidence to establish that any representations in the March 22, 1989, letter were adopted in accordance with formal amendment procedures. Plaintiffs have failed to point to any evidence that any amendment of the du Pont severance plan modifying Plaintiffs' status as severance-ineligible was adopted by the Executive Committee. Nor is there any evidence that the Construction Division made any modification of the severance pay procedure. Absent such evidence, Plaintiffs' contentions regarding the effects of the March 22, 1989, letter must fail as a matter of law. *Id.*

Plaintiffs also claim that the original SPD for the severance plan provided that "the Company reserves the right to change, modify or discontinue the plan at its discretion," and that this language provides that amendment of the plan could occur through Mr. Heckert's letter. [Plaintiffs' Brief, at 2.] In making this argument, Plaintiffs overlook the written plan instrument and prior du Pont practice, which make clear that plan amendments could occur only through Executive Committee action (as to plan structure) or Construction Division management (as to plan implementation).

■ Furthermore, even if Plaintiffs were correct that the SPD provided that the du Pont severance plan could be amended at any time, and that the plan itself did not contain a formal amendment procedure, their claims would still be without merit. In *Biggers*, the Fourth Circuit faced the issue whether, and under what conditions, an employee welfare benefit plan could be amended

when "although it may be terminated or amended, provides no mechanism or standard for doing so." *Biggers,* 4 F.3d at 295. The court held that "in the absence of provisions in a plan that provide procedures for amendment, a writing amends a plan only when accompanied by a clear manifestation of an intent to alter the policy or plan." *Id.* at 296.

■ The question presented in the present case, therefore, is whether the March 22, 1989, letter and the circumstances surrounding the distribution of the letter establish a clear manifestation of intent to amend the severance plan, making Plaintiffs eligible for severance pay. The stipulated facts make clear that there was no clear manifestation of intent to amend the severance plan. The Letter was not intended to be distributed to Plaintiffs and could not have been intended to amend Plaintiffs' status. The letter does not make any reference to amending the plan. Nor does it make any reference to Plaintiffs' class of employees. A clear manifestation of intent to amend a plan requires at the very least a reference to the amendment.

The letter clearly was not intended to amend the severance plan. The letter repeatedly refers to du Pont's intention to honor the terms of its existing severance plan, but makes no mention of amending the plan. Mr. Heckert makes reference to du Pont's severance policy as expressed over "many years," and to political pressure on du Pont to breach its obligation to make "severance payments in accordance with du Pont policy. [Ex. 22.] Later in the letter, Mr Heckert states du Pont's intention to meet its "clear" obligation to pay severance benefits according to "our employment policies and practices." [Ex. 22.] At the end of the letter, Mr. Heckert states that du Pont "will pay severance to Savannah River employees according to our policy." [Ex. 22.] The only reference to modification of the severance plan explains the 1985 severance plan amendments adopted by the Executive Committee and the decision not to apply the amendments retroactively. [Stip. 9; Ex. 22.] The letter's stated intent and numerous references to du Pont's obligations under and intentions to comply with the existing severance plan demonstrate that the letter was not intended to amend the plan.

■ Plaintiffs also contend that the March 22, 1989, letter operates to create a "standalone" SPD. This contention is also without merit. In *Elmore,* the Fourth Circuit rejected a similar contention that a letter from a CEO could create an "informal" ERISA benefit plan. The court explained:

> An informal plan may exist independent of, and in addition to, a formal plan as long as the informal plan meets all of the elements outlined in *Donovan [v. Dillingham,* 688 F.2d 1367 (11th Cir.1982) (en banc) ]. *See Henglein v. Informal Plan for Plant Shutdown Benefits for Salaried Employees,* 974 F.2d 391, 400 (3d Cir.1992) (absence of integration clause in a formal plan and distribution of informal documents may lead the court to find that an informal plan existed in addition to the formal plan).
>
> Applying these criteria, the surplus claim clearly does not constitute an informal plan existing independent of the 1983 ESOP. Although the first three *Donovan* elements (the intended class of beneficiaries, the intended benefits, and the source of the funding) arguably may be ascertainable from the [CEO's] letters, these letters do not satisfy the fourth element (the procedure for receiving benefits). The only way an employee could ascertain the procedures for obtaining benefits would be to refer to the ... formal plan document....

*Elmore,* 23 F.3d at 861–62.

The Heckert letter makes numerous references to the existing severance plan. The letter does not contain any information regarding the method of calculating severance pay under the plan or determining severance eligibility. [Ex. 22.] Instead, that information could only be determined by referring to the text of the existing severance plan. [Exs. 2–4, 9.] Therefore, Plaintiffs cannot satisfy the *Donovan* test for establishing an "informal" severance plan. *See also Carver v. Westinghouse Hanford Co.,* 951 F.2d 1083 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3036, 120 L.Ed.2d 905 (1992) (holding that informal plan under *Donovan* creat-

ed only if surrounding circumstances demonstrate creation of *de facto* pension plan).

Plaintiffs also allege "detrimental reliance" upon the March 22, 1989, letter which they assert supports their claim for benefits under an implied, unilateral contract theory arising under South Carolina law. [Plaintiffs' Brief, at 3–4 citing *Small v. Springs Industries, Inc.*, 292 S.C. 481, 357 S.E.2d 452 (1987).] The court has already ruled, at the hearing on April 20, 1994, that ERISA completely preempts any contractual claims asserted by Plaintiffs under South Carolina law including any theory outlined in *Small.* Therefore, Plaintiffs' reliance upon *Small* is misplaced.

 Although state law contract causes of action are not applicable to an ERISA action, in limited circumstances, a showing of detrimental reliance may be relevant under a federal common law theory of equitable estoppel. In *Elmore*, the Fourth Circuit permitted claims for benefits arising out of two letters from the company's CEO to proceed under principles of equitable estoppel, subject to the plaintiffs showing detrimental reliance. *Elmore*, 23 F.3d at 863. In *Elmore*, however, the formal adoption of the benefit plan followed the CEO's letters. By contrast, in the present case, du Pont's severance plan was adopted and in force for thirty three years prior to Mr. Heckert's letter. This distinction is fatal to Plaintiffs' attempt to rely upon an equitable estoppel theory to modify the existing du Pont severance plan. *Elmore*, 23 F.3d at 868–69 (holding that estoppel principles cannot be used to effect a modification of an existing ERISA benefit plan).

 Furthermore, even if Plaintiffs could bring their claims pursuant to a federal common law theory of equitable estoppel, they cannot make the necessary showing of detrimental reliance. Plaintiffs have the burden of showing by a preponderance of the evidence that they reasonably relied upon the alleged representations contained in the March 22, 1989, letter to their detriment.

*Elmore*, 23 F.3d at 863. The stipulated facts make clear that Plaintiffs cannot make the required showing. Plaintiffs contend that as a result of reading the letter, they "withheld their search" for other employment "in anticipation of being paid" severance benefits. [Plaintiffs' Brief, at 3.] Plaintiffs offer no supporting citation for this contention and there is no support in the stipulated record. Therefore, Plaintiffs have failed to meet their burden of producing evidence of detrimental reliance. *See Amwest Sur. Ins. Co. v. Republic Nat. Bank*, 977 F.2d 122, 124 (4th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1582, 123 L.Ed.2d 149 (1993) (To withstand summary judgment, non-moving party may not rest upon mere allegations or denials but must designate specific facts showing genuine issue for trial).

 Plaintiffs focus on the original 1950 Savannah River Site "interim" letter contract between du Pont and the United States Government as further support of their claim.[1] Plaintiffs contend that language in this 1950 agreement created an obligation to pay severance benefits to all Savannah River Site employees and that no effort to notify Plaintiffs in writing of any subsequent amendment was ever made. This argument is also meritless. First, for many years, the 1950 interim agreement was classified and obviously was not "distributed" to du Pont employees as an announcement of a benefit plan. Second, the portion of the document cited by Plaintiffs merely references the Government's obligation to reimburse du Pont for all payments made according to the terms of du Pont's established benefit plans. It does not set forth any specifics regarding du Pont's benefit plans. Third, the du Pont severance plan was not even adopted until 1956. [Stips. 5–6.] Plaintiffs have failed to explain how the 1950 interim agreement can be relevant to the interpretation of provisions of a benefit plan which did not even exist at the time.

Finally, Plaintiffs reference various communications from du Pont Petrochemicals of-

---

1. This document was not included in the exhibits to the joint stipulated material facts submitted to the court. Relevant excerpts of the operating contract between du Pont and the Department of Energy were included in Exhibit 1 and refer- enced in Stipulation 18. Exhibit 1 clearly indicates that the interim agreement was merged into and superseded by subsequent versions of the operating contract.

ficials. Like the March 22, 1989, letter, these communications were not directed, addressed, or distributed to Plaintiffs. Instead, each specifically referenced a department and division in which Plaintiffs were not employed. Moreover, they were distributed by managers to whom Plaintiffs did not report. Furthermore, none of these communications indicate an intention to amend the severance plan so that Plaintiffs would be eligible for severance benefits. For example, a May 25, 1989, letter to the editor of the *Augusta Chronicle* from E.F. Ruppe, vice president of du Pont Petrochemicals, specifically states its intention as being a defense of du Pont's plans to abide by the terms of the company's severance benefit policy in the face of media criticism. [Exhibit 16–17.] No mention is made of any new amendments to the severance plan. Similarly, the August 24, 1988, letter written by J.T. Granaghan, SRP manager, specifically states the company's intention to "reaffirm DuPont's position" regarding the integrity of the existing severance plan. [Ex. 15.]

■ The court received an untimely reply from Plaintiffs which was filed on September 27, 1994.[2] A scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril. *Johnson v. Mammoth Recreation, Inc.*, 975 F.2d 604, 610 (9th Cir.1992); *Gestetner Corp. v. Case Equip. Co.*, 108 F.R.D. 138, 141 (D.Me.1985). The court would be justified in refusing to consider Plaintiffs' reply. However, the arguments in Plaintiffs' reply are meritless.

### V. Conclusion

For the foregoing reasons, the court finds Plaintiffs' arguments to be without merit. Plaintiffs are not entitled to severance benefits. Accordingly, the court grants summary judgment in favor of du Pont.

IT IS SO ORDERED.

---

2. The court's scheduling order filed on June 8, 1994 required Plaintiffs to file their reply on or before September 16, 1994. Plaintiffs also filed their initial brief a week late and filed a supplementary brief without leave of court.