**DILMAR OIL COMPANY, INC., Plaintiff,**

v.

**FEDERATED MUTUAL INSURANCE COMPANY, Defendant.**

No. CIV. A. 4:96-114-22.

United States District Court, D. South Carolina, Florence Division.

March 25, 1997.

William Thomas Lavender, Jr., Susan Batten Lipsomb, Nexsen Pruet Jacobs and Pollard, Columbia, SC, for Plaintiff.

Laura J. Hanson, Nicholas A. Gumpel, Susan M. Radde, Peter G. Lennington, Meagher & Geer, Minneapolis, MN, Richard F. Mehrhof, Jr., Allgood Childs Mehrhof and Millians, Augusta, GA, for Defendant.

## ORDER

CURRIE, District Judge.

This is an environmental insurance coverage case initiated by plaintiff Dilmar Oil Company, Inc. (Dilmar) against defendant Federated Mutual Insurance Company (Federated). Dilmar principally claims that the terms of a Federated pollution liability policy required Federated to provide coverage for

petroleum contamination caused by releases of petroleum products from Dilmar's underground storage tanks. By its Complaint, Dilmar claims Federated breached its insurance contract by refusing to provide coverage, and that the breach was in "bad faith." Dilmar also advances alternative claims of misrepresentation, breach of oral contract, and illusory coverage. Jurisdiction as to all claims is based upon diversity of citizenship, 28 U.S.C. § 1332.

The matter came before the court for hearing on January 15, 1997. Two motions were pending before the court at the time of hearing: Federated's Motion for Summary Judgment, filed November 26, 1996; and Dilmar's Motion to Amend Complaint and to Join a Party, also filed November 26, 1996. At the hearing on these motions, the court granted Dilmar's request for supplemental briefing and evidentiary submissions. Dilmar filed its Supplemental Memorandum and evidentiary submissions on January 30, 1997. On February 7, 1997, Federated filed a Motion to Strike Additional Submissions of Dilmar Oil Company, and also filed a Supplemental Brief.

The court has reviewed all of the briefs and exhibits, and has studied the applicable law. For the reasons given below, the court: (1) grants Federated's Motion for Summary Judgment; (2) denies Dilmar's Motion to Amend Complaint and to Join a Party; and (3) denies Federated's Motion to Strike Additional Submissions of Dilmar Oil Company.

## I. FACTUAL BACKGROUND

The following facts are drawn from the complete record before the court, including all pleadings, briefs, affidavits, depositions, or other filings. All of the following facts are undisputed. For purposes of the analyzing Federated's Motion for Summary Judgment, all inferences are drawn in Dilmar's favor.

Dilmar is a large petroleum marketer based in Latta, South Carolina. Dilmar operates numerous gasoline stations and convenience stores, and several bulk petroleum plants in South Carolina. Federated is a mutual insurance company based in Minnesota that has targeted petroleum marketers as a niche market for its insurance products for over twenty years. Federated insured Dilmar under successive Commercial Package Policies in effect from January 1, 1987 to January 1, 1992. The only coverage at issue in this lawsuit is the Pollution Liability Coverage in effect from January 1, 1989 to July 1, 1989 (the "Policy").

### A. Dilmar's 1989 Voluntary Pollution Clean-Up Claims

During the first half of 1989, Dilmar voluntarily tested several of its bulk plants and retail gasoline stations for possible petroleum contamination.[1] Between March and June 1989, Dilmar confirmed petroleum contamination at eight of its sites.[2] Dilmar promptly reported the contamination to the South Carolina Department of Health and Environmental Control ("DHEC"). Dilmar hired its own environmental consultants to contain, remove, and abate the confirmed contamination.

Because the contamination at Dilmar's sites resulted from leaking underground petroleum storage tanks, Dilmar sought reimbursement of its clean-up costs from DHEC under the South Carolina State Underground Petroleum Environmental Response Bank Act, S.C.Code Ann. §§ 44–2–10, et seq. ("the Superb Act"). At that time, the Superb Act provided Dilmar with a vehicle by which it could obtain reimbursement for the clean-up costs Dilmar incurred through the "Superb Account." In relevant part, Section 44–2–130(A) provided:

---

1. Dilmar was one of many South Carolina underground storage tank operators who voluntarily tested their sites for petroleum contamination in 1989. They did this to take advantage of the State's "amnesty" program, permitting them to receive reimbursement for any clean-up costs, as long as the contamination was reported by December 31, 1989.

2. Petroleum contamination was discovered at the following Dilmar sites: (1) Florence Bulk Plant, Florence, S.C.; (2) North Myrtle Beach Texaco, North Myrtle Beach, S.C.; (3) Hayes Texaco, Latta, S.C.; (4) Food Chief #24, Mullins, S.C.; (5) Food Chief #35, Conway, S.C.; (6) Pat's Superette, Florence, S.C.; (7) Northside Texaco, Myrtle Beach, S.C.; and (8) Jamestown Texaco, Conway, S.C.

To encourage voluntary rehabilitation, a person conducting site rehabilitation under Section 44–2–110, which defines the early detection incentive program, either through his own personnel or subcontractors, is entitled to directly bill the Superb Account or be reimbursed for reasonable costs incurred in connection with the site rehabilitation if prior approval therefor is obtained from the department. Prior to or during the grace period established under the early detection incentive program, the person is eligible to directly bill or be reimbursed for all reasonable costs incurred in connection with site rehabilitation.

Act 486 § 2, 1988 Statutes at Large, pp. 4074–75.

As originally enacted, the Superb Act provided for reimbursement of on-site clean-up costs without regard to the existence of insurance if the site was reported during the "grace period." [3] Thus, Dilmar was entitled to receive Superb Act reimbursement from DHEC "without recourse to reimbursement or recovery." *Id.* at 4073–74.

In addition to notifying DHEC, Dilmar also timely submitted first-party voluntary clean-up cost claims to Federated. The Federated Policy in effect at the time Dilmar submitted its 1989 claims was a six-month "claims made" policy. In order to potentially invoke coverage under the Policy, a claim must be made "during the policy period"— January 1, 1989 to July 1, 1989. Dilmar testified that it understood the meaning of the "claims made" requirement. The Policy contained three separate and distinct insuring agreements, two of which are not applicable to Dilmar's 1989 coverage claims.

**B. The Federated Policy Terms**

Insuring Agreement 1 provides third-party liability coverage for "Bodily Injury and Property Damage Liability." It provides, in relevant part:

This insurance applies to "bodily injury" and "property damage" only if a claim for damages because of the "bodily injury" or "property damage" is first made in writing against any insured during the policy period.

Because no third-party claims for bodily injury or property damage liability were first made against Dilmar in writing during the Policy, Insuring Agreement 1 has not been triggered.

Insuring Agreement 2 provides for "Reimbursement of Mandated Off–Site 'Clean-up Costs.'" Insuring Agreement 2 provides, in pertinent part:

The insured's obligation to pay "clean-up costs" because of "environmental damage" must be asserted under statutory authority of the government of the United States of America, Canada or. any political subdivision of the United States or Canada. Notice asserting such obligation must be first received by you during the policy period.

Because no governmental authority issued an order mandating clean-up during the Policy, Insuring Agreement 2 has not been triggered.

Insuring Agreement 3 was added to the Policy by endorsement. It provides coverage for "Voluntary 'Clean-up Costs' Reimbursement." In relevant part, Insuring Agreement 3 provides:

We will reimburse the insured for other "clean-up costs" initiated at the "insured site" during the policy period that the insured incurs, provided that:

a. The insured gives us *immediate notice* of an actual or suspected "pollution incident" that commences on or after the Retroactive Date shown in the Declarations;

Federated has acknowledged that Dilmar's voluntary clean-up claims submitted to Federated during 1989 triggered Insuring Agreement 3.

The Policy at issue was also subject to the "Coordination of Benefits With Governmental Funding Program" Endorsement (the "Coordination of Benefits Endorsement"). The Endorsement reads:

---

**3.** *See* Section 44–2–110 as originally enacted, Act No. 486, § 2, 1988 Statutes at Large, pp. 4073–74. The "grace period" for reporting site contamination was December 31, 1987 to December 31, 1989.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### COORDINATION OF BENEFITS WITH GOVERNMENTAL FUNDING PROGRAMS POLLUTION LIABILITY COVERAGE PART

As a condition for this policy to apply, it is agreed that the insured shall:

a. pay all fees, taxes, or premiums; and

b. complete all required applications and registration forms; and

c. comply with all laws, regulations or statutes

in order to secure available funds from any governmental funding programs. Any failure or inability to secure funds from any program shall void this insurance to the extent that such funds would have applied to any loss covered under this insurance. *If the inability to secure funds is directly attributable to the existence of this insurance, coverage shall also be void so as to permit contribution from any such governmental funding program.*

It is further agreed that any sum payable by a governmental funding program to the insured or on behalf of the insured shall reduce the Limits of Insurance shown in the Declarations by a corresponding amount if such payment would otherwise have been made under this insurance.

We reserve the right to recover all or part of any payment made to the insured by a governmental funding program as reimbursement for losses incurred under this insurance.

(emphasis added). Federated properly filed the Endorsement with the South Carolina Department of Insurance, and the Endorsement was approved for use in October 1988.

Before Federated added the Coordination of Benefits Endorsement to the Policy, Federated sent Dilmar a notice stating, in relevant part:

### AN IMPORTANT NOTICE OF PREMIUM AND COVERAGE CHANGES

\* \* \* \* \* \*

Many states have implemented or are considering the implementation of governmental funding programs to address the clean up and/or third party liability costs of pollution losses from petroleum storage tank systems.

A new endorsement is being attached to your pollution policy which requires you to register and pay all applicable fees, taxes or premiums to obtain available funds from any governmental funding program so that benefits from your policy and the funding program are properly coordinated. Failure to secure funds from any such program shall void coverage to the extent that such funds would have applied to any loss covered under the policy. Also, any sum payable by a governmental funding program shall reduce the limits of insurance by a corresponding amount if the payment would otherwise have been made under the policy.

Dilmar received this notice before inception of the Policy.

### C. Federated's Response To the 1989 Claims

Around the time that Dilmar submitted its claims to Federated in the spring and summer of 1989, DHEC corresponded with Federated, stating that "sites where there was insurance coverage available were not eligible for reimbursement under the [Superb] program." DHEC explained: "The Department does not feel it is reasonable to pay expenses that a tank owner has been paying insurance premiums or maintaining some other financial instrument to cover." Because DHEC took the position that the existence of Federated's insurance coverage would defeat Dilmar's eligibility for Superb Account reimbursement, the Coordination of Benefits language was triggered to "void" coverage under the Policy for Dilmar's 1989 first-party voluntary clean-up cost claims.

Accordingly, Federated denied coverage by letters dated June 15, 1989 and July 27, 1989 based upon the Coordination of Benefits Endorsement. Federated's act of denying coverage under the Policy cleared the way for Dilmar to procure reimbursement under

the Superb Act. DHEC then began reimbursing Dilmar for clean-up costs incurred by Dilmar at its contaminated sites. Dilmar has conceded that in 1989, Federated's denials of coverage were proper under both the Coordination of Benefits Endorsement and the SUPERB Act as they existed at that time.[4]

### D. Legislative Reaction To The Coordination Of Benefits Endorsement—The 1990 and 1992 Amendments To the Superb Act.

"Possibly as a response to the Coordination of Benefits Clause in the 1989 Policy, DHEC drafted amendments to the Superb Act." *Ken Moorhead Oil Co., Inc. v. Federated Mut. Ins. Co.*, 323 S.C. 532, 476 S.E.2d 481, 484 (1996). Two of these amendments, effective May 9, 1990, critically altered the relationship between DHEC, Dilmar and Federated. Section 44–2–70(A) provided, in pertinent part, that:

> *No insurance policy,* guarantee, surety bond, or any other financial responsibility mechanism which is executed to provide this or additional amounts of coverage *shall contain any terms, endorsements, conditions, provisions, or other language that requires expenditure of funds from the Superb Account prior to or in lieu of payment by the mechanism.*[5]

Another 1990 amendment provided, in relevant part:

> *If a liability insurance policy* or any other financial responsibility mechanism which provides coverage for sudden or nonsudden release of petroleum or petroleum products from an underground storage tank *has been executed for a site at which reimbursement or direct billing from the Superb Account is sought, no funds may be expended from the Superb Account until the funds provided by the*

*financial responsibility mechanism have been exhausted.*[6]

These amendments, commonly referred to as the 1990 Amendments, effectively suspended DHEC's continuing obligation to reimburse Dilmar for clean-up costs incurred until the limits of the Federated Policy had been exhausted. In response to the 1990 Amendments, Federated stopped issuing pollution coverage for underground storage tanks in South Carolina. As to claims previously denied because of the Coordination of Benefits Endorsement in the 1989 Policy, two insureds ultimately sued Federated (see discussion below). No other insured contacted Federated in response to the 1990 Amendments.

In 1992, the General Assembly adopted an additional amendment to Superb, reiterating that Federated's policy was primary, and Superb was excess—without regard to the Coordination of Benefits Endorsement. This amendment was effective July 1, 1992 ("1992 Amendment"). It states, in relevant part:

> *[N]o such financial responsibility mechanism which has previously been executed shall operate so as to require the expenditure of funds from the Superb Account . . . until funds provided by the financial responsibility mechanism have been exhausted.*[7]

After passage of the 1990 Amendments, one of Federated's insureds, Ken Moorhead Oil Company, timely filed a lawsuit against Federated in November 1991. Moorhead alleged, in part, that it was entitled to coverage under the 1989 Policy containing the Coordination of Benefits Endorsement. Federated argued that the 1990 and 1992 Amendments did not apply retroactively, but if they did, the Amendments were an unconstitutional impairment of contract. Federated's arguments were rejected by the South Carolina Supreme Court. *See Moorhead,* 323 S.C. 532, 476 S.E.2d 481 (1996).

---

4. Federated similarly denied coverage for other South Carolina insureds' claims under the 1989 Policy.

5. Section 44–2–70(A), as amended on May 9, 1990, Act 473 § 3, 1990 Statutes at Large 2134–35 (emphasis added).

6. Section 44–2–130(B), as amended on May 9, 1990, Act 473 § 7, 1990 Statutes at Large 2137–38 (emphasis added).

7. Section 44–2–70, as amended on July 1, 1992, Act 501 § 43(D), 1992 Statutes at Large 3318–19 (emphasis added).

After passage of the 1992 Amendment, another Federated insured, W.H. Bristow, Inc. ("Bristow"), timely filed suit against Federated in state court in December 1992. Federated removed the case to this court. *W.H. Bristow, Inc. v. Federated Mut. Ins. Co.,* C.A. No. 4:93–35–2 (D.S.C., Florence Div.). Again, one of the issues in *Bristow* was whether Federated could "void" coverage under the Coordination of Benefits Endorsement in the 1989 Policy. After DHEC was third-partied into the case, Federated filed a motion for summary judgment on this issue. Federated also argued that to the extent the 1990 and 1992 Amendments to the Superb Act operate retroactively to invalidate the Coordination of Benefits Endorsement, those amendments were unconstitutional impairments of existing contracts. In the wake of the *Moorhead* decision, the claims between Federated and Bristow in the *Bristow* action were ultimately settled, and DHEC was then dismissed from the case.

Other than Moorhead and Bristow, no other South Carolina insured contacted Federated requesting reconsideration of its decision to "void" coverage for their claim under the Coordination of Benefits Endorsement.

### E. DHEC's 1994 Order That Dilmar Conduct Mandated Off–Site Clean-up— The Rice Planters Site Claim.

In June 1994, DHEC informed Dilmar of an investigation that had been conducted at a site known as the Rice Planters Restaurant Site in Myrtle Beach, South Carolina. A complaint of gasoline vapors at the site prompted the investigation. DHEC attributed the Rice Planters Site contamination to petroleum contamination migrating from Dilmar's Northside Texaco site. DHEC then ordered Dilmar to "initiate appropriate abatement procedures as soon as technically possible" at the Rice Planters Site.

Dilmar questioned whether its Northside Texaco facility was the most probable source of contamination at the Rice Planters Site. Nevertheless, Dilmar stated it was "prepared to mobilize immediately to investigate this matter; however, in light of the fact that Northside Texaco site has been qualified for Superb account funds, we believe that all

reasonable costs of rehabilitation must be born by the Superb account"—via direct billing. DHEC understood Dilmar's response as a refusal to undertake clean-up. Accordingly, DHEC stated that it would proceed with site remediation at Rice Planters with LUST Trust funds—and would bring a cost recovery action against Dilmar sometime in the future.

In August 1994, Dilmar's counsel wrote Federated advising it of this "recent claim" involving a DHEC "directive" associated with contamination found at Rice Planters. Dilmar demanded that Federated defend and indemnify Dilmar for "any liability incurred in connection with this location, including site rehabilitation costs and third party bodily injury and property damage claims." On January 23, 1995, Federated denied coverage for the new Rice Planters Site claim. Federated explained that coverage was denied under the pollution policies because there was no "claims-made" pollution policy in effect at the time the government mandate was sent to Dilmar in June 1994.

### F. Dilmar's Lawsuit Against Federated

On January 12, 1996, Dilmar instituted this lawsuit alleging Federated breached its insurance contract and acted in bad faith by refusing to provide coverage for the 1989 claims, contending that the Coordination of Benefits Endorsement was invalid pursuant to South Carolina statutes. Alternatively, Dilmar claimed that Federated should be held liable based upon allegations of misrepresentation, breach of oral contract, and illusory coverage. Dilmar also alleged that Federated breached its contract when it refused to provide coverage for the 1994 claim at the Rice Planters Site. After the close of discovery, on November 26, 1996, Federated filed its Motion for Summary Judgment as to all claims advanced by Dilmar. On the same day, Dilmar filed a Motion to Amend Complaint and Join a Party. Dilmar's proposed Amended Complaint (adding DHEC as a party) alleges that if it should be determined that Dilmar is not entitled to coverage under the Federated Policy, then Dilmar is entitled to an order declaring its rights to Superb Act reimbursement from DHEC.

This court first addresses the merits of Federated's Motion for Summary Judgment, and then considers Dilmar's Motion to Amend to join DHEC as a party, and finally, Federated's Motion to Strike. Although Federated raises numerous grounds for summary judgment on all of Dilmar's claims, this court finds that two of the grounds are dispositive of this case, and addresses only those. Federated argues that (1) Dilmar's 1989 voluntary clean-up cost claims are barred by South Carolina's three-year statute of limitations; and (2) there is no coverage for the 1994 governmentally mandated clean-up at the Rice Planters Site, because DHEC's claim was not made against Dilmar during the period of any pollution liability policy.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment separates the wheat from the chaff, and disposes of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). A summary judgment motion requires the court to look beyond the pleadings and ask whether there is a genuine need for trial. *Matsushita Electric Industr. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–53, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). If a defendant demonstrates the absence of evidence to support a claim, then plaintiff must come forward with evidence to show that there remains a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324–25, 106 S.Ct. at 2553–54. An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for plaintiff. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. A "material" fact issue is one that might affect the outcome of the lawsuit under governing substantive law. *Id.* A complete failure of proof concerning an essential element of a plaintiff's case necessarily renders all other facts immaterial.

*Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2551–52. Production of a "mere scintilla of evidence" in support of an essential element will not forestall summary judgment. *Anderson*, 477 U.S. at 251, 106 S.Ct. at 2511.

## III. SUMMARY JUDGMENT ANALYSIS

### A. Dilmar's 1989 Voluntary Pollution Clean–Up Claims—Statute of Limitations

Dilmar's lawsuit against Federated is principally a breach of contract action. Dilmar alleges that Federated breached its contract by refusing to pay Dilmar's 1989 claims for voluntary clean-up cost reimbursement, and that this breach was in bad faith. Dilmar also seeks recovery under alternative claims of misrepresentation, breach of oral contract, and illusory coverage.

The 1990 Amendments to the Superb Act retroactively invalidated Federated's Coordination of Benefits Endorsement—the sole basis upon which Federated denied coverage. *Ken Moorhead Oil Co., Inc. v. Federated Mut. Ins. Co.*, 323 S.C. 532, 476 S.E.2d 481, 484 (1996) (affirming trial court's finding that both the 1990 and 1992 Amendments to the Superb Act applied retroactively and that such retroactive application was constitutional). In light of the South Carolina Supreme Court's decision in *Moorhead*, this court concludes that Federated was contractually obligated to provide coverage for Dilmar's 1989 voluntary clean-up cost reimbursement claims. Thus, Dilmar's alternative theories of recovery (misrepresentation, breach of oral contract, and illusory coverage) are rendered moot. The court also finds that Dilmar has abandoned its bad faith breach of contract claim (see discussion below).

Having reached these conclusions, the court is poised to address the primary issue presented by Federated's summary judgment motion, namely: Is Dilmar's breach of contract action against Federated, initiated over five-and-a-half years after the effective date of the 1990 Amendments, barred by the applicable statute of limitations? Federated argues that under Section 15–3–530(1) of the

South Carolina Code, Dilmar had three years from the passage of the 1990 Amendments (May 9, 1990) in which to initiate its contract claims against Federated relating to the 1989 coverage denials. The court agrees with Federated's argument.

At the outset, this court remarks that both parties agree that at the time Federated issued its 1989 coverage denials, there was no statutory prohibition on Federated's ability to coordinate its insurance with Superb. Because DHEC had taken the position that the existence of Federated's insurance coverage would defeat Dilmar's eligibility for Superb Account reimbursement, the Coordination of Benefits language was triggered to "void" coverage under the Policy for Dilmar's first-party voluntary clean-up cost claims. In fact, Federated's act of denying coverage enabled Dilmar to gain access to the Superb Account and receive reimbursement for clean-up costs Dilmar incurred.

But the rules of the game changed in May 1990. Under the 1990 Amendments, DHEC was given the following mandate: "[N]o funds may be expended from the Superb Account *until* funds provided by the [insurance policy] have been exhausted."[8] Thus, the 1990 Amendments *suspended* DHEC's continuing obligation to pay Dilmar's clean-up costs until the limits of the Federated Policy had been exhausted. After May 9, 1990, Dilmar was not entitled to Superb Account reimbursement for clean-up costs incurred *until* Dilmar exhausted the limits of the Federated Policy.

■ In South Carolina, the applicable limitations period for actions on a contract is found in S.C.Code Ann. § 15–3–530(1). For causes of action arising or accruing on or after April 5, 1988, the applicable statutory period is three years. *Id.* Under South Carolina law, the fundamental test for determining whether a cause of action has accrued is whether the party asserting the claim can maintain an action to enforce it. A cause of action accrues at the moment the plaintiff has a legal right to sue on it. *Brown v. Finger,* 240 S.C. 102, 124 S.E.2d 781 (1962). Stated differently, a cause of action accrues, so as to start the running of the statute of limitations, as soon as the right to institute and maintain an action arises. *Walter J. Klein Co. v. Kneece,* 239 S.C. 478, 123 S.E.2d 870, 874 (1962).

■ This court concludes that as a matter of law, passage of the 1990 Amendments marked the accrual date for Dilmar's "right" to seek a judicial declaration that Federated was obligated to provide coverage under the Policy, notwithstanding the Coordination of Benefits Endorsement. In other words, on May 9, 1990, a cause of action accrued against Federated for refusing to provide coverage based upon this Endorsement. Under the applicable statute of limitations, Dilmar was therefore required to initiate its contract action against Federated on or before May 9, 1993. Because Dilmar failed to file suit until January 12, 1996, Dilmar's contract action on the 1989 claims is time-barred.[9]

In response to Federated's motion for summary judgment on this issue, Dilmar has offered several unavailing arguments urging this court to adopt December 9, 1993, as the accrual date of its cause of action. Each of Dilmar's arguments is premised on its contention that it could not have maintained a contract action against Federated until it received a letter from DHEC dated December 9, 1993. The court addresses the substance of this letter because the parties disagree as to its significance.

The December 9, 1993, DHEC demand letter was actually a follow-up to an earlier September 3, 1992, demand letter. In the first demand letter, DHEC notified Dilmar that it would stop paying clean-up costs at one of Dilmar's sites; that previously paid costs were being tallied; and that Dilmar must reimburse DHEC for those costs.[10] In

---

8. Section 44–2–130(A), as amended on May 9, 1990, Act 473 § 7, 1990 Statutes at Large, p. 2138.

9. The court also notes that even if the adoption of the 1992 Amendments were the accrual date, Dilmar's lawsuit is untimely.

10. On September 3, 1992, DHEC wrote Dilmar regarding continued Superb funding at one of its

the December 9, 1993, demand letter, DHEC followed through on its promise to provide the total amount of clean-up costs paid by DHEC at two of Dilmar's sites. For the remaining Dilmar sites, DHEC stated "[t]his office will, in the near future, provide you with the total amount of funds due to the SUPERB Account by Dilmar." This last statement is virtually identical to DHEC's initial September 3, 1992, repayment demand. The December 9, 1993, letter simply restated DHEC's consistent position that the 1990 and 1992 Amendments invalidated the Coordination of Benefits Endorsement and precluded Superb reimbursement unless the Federated Policy limits were exhausted. The letter did not change the relationship between Dilmar and DHEC.

### 1. Dilmar's Claim That It Did Not Sustain Actual Injury Until December 9, 1993.

Dilmar claims it could not have sued Federated for breach of contract before December 9, 1993, because Dilmar had not sustained any "actual injury" from the breach until that moment. The court finds that Dilmar's argument is inconsistent with the record in this case and the applicable law.

The court notes initially that, as set forth above, there was nothing in the December 9, 1993, demand letter that caused Dilmar to "sustain" any "injury" different from the first demand letter received over a year earlier.[11] It is undisputed that the 1990 Amendments terminated DHEC's continuing obligation to

pay Dilmar's clean-up costs. While DHEC's decision to continue funding the clean-up is no doubt puzzling, DHEC's failure to actively enforce the 1990 Amendments is immaterial to Dilmar's contract claims against Federated. Dilmar's claims are in fact predicated on the provisions of the 1990 Amendments, and thus, accrued in May 1990. The amendments terminated DHEC's obligation to reimburse Dilmar, and invalidated Federated's basis for denying coverage. Dilmar has cited no South Carolina authority standing for the proposition that a breach of contract cause of action does not accrue so long as the obligations of the breaching party are being paid by a stranger to the contract.

■ Under South Carolina law, "the statutory period of limitations begins to run when a person could or should have known, through the exercise of reasonable diligence, that a cause of action might exist in his or her favor, rather than when a full-blown theory of recovery is developed." *Christensen v. Mikell,* 324 S.C. 70, 476 S.E.2d 692, 694 (1996). It is completely immaterial that the claimant did not know the exact nature of the wrong or the extent of the damages at the time. *Id.* ("Even if appellant did not know the exact nature of the wrong or the extent of the damages in 1986, he should have known that his expectation of title insurance coverage had not been met...."). Dilmar's failure to appreciate *the extent of its damages* does not forestall the accrual of its

sites, Food Chief # 24. Quoting the 1990 Amendment language, DHEC informed Dilmar that "no insurance policy ... shall contain any terms, endorsements, conditions, provisions, or other language that requires expenditure of funds from the SUPERB Account prior to or in lieu of payment by the mechanism." DHEC's letter continued:

A file review reveals that an Insurance policy through Federated Insurance exists for the referenced facility with a $25,000 deductible. *The [Federated] policy contains a "coordination of benefits" clause which, per the statute, cannot be honored in this state, therefore additional payments from the SUPERB Account are not deemed appropriate.*
* * * * *
*This office will, in the very near future, provide you with the total amount of funds owed to the SUPERB Account by Dilmar Oil.*

Please note that although SUPERB monies are no longer available for this site, site assessment and rehabilitation activities are required to proceed in a timely manner.
(emphasis added).

11. Although there is a series of correspondence between Dilmar and DHEC with respect to this issue beginning on September 3, 1992, Dilmar points to the December 9, 1993, letter because it is the only one that bears a date less than three years prior to the date this lawsuit was initiated. The court does not believe any of the correspondence is relevant to determining the accrual date for the statute of limitations. However, the court notes that the December 9, 1993, letter was not Dilmar's first notice from DHEC that Dilmar had a right to sue Federated.

cause of action. *Id.* Accordingly, the court rejects Dilmar's argument.

### 2. Dilmar's Claim That No Costs were "Incurred" Until December 9, 1993.

Dilmar also argues that no costs were "incurred"—as that term is used in the Federated Policy—until the date of the second DHEC demand letter of December 9, 1993. Dilmar insists that this was the first indication Dilmar had that it would face any potential liability for clean-up costs at those sites. The court rejects Dilmar's argument as both factually and legally incorrect.

In 1989, Dilmar voluntarily tested its sites and confirmed petroleum contamination. Dilmar hired its own environmental consultants to contain, remove and abate the contamination as required by several South Carolina environmental statutes and regulations.[12] While Dilmar "voluntarily" complied with its legal obligations, Dilmar faced certain liability for any failure to voluntarily initiate clean-up at that time.[13] Consequently, Dilmar's assertion that it did not "incur" costs from the moment it initiated clean-up at its contaminated sites is unfounded. Dilmar's eligibility for Superb Act *reimbursement* does not alter the fact Dilmar was the responsible party obligated to conduct the clean-up and "incur" the associated costs, as is more clearly revealed in the language of the Superb Act.

The Superb Act required Dilmar to respond to the release of petroleum product from Dilmar's underground storage tanks, and incur the associated costs. *See* S.C.Code Ann. § 44–2–80(A). Because Dilmar reported the contamination to DHEC during the "early detection incentive program," the original Superb Act language permitted a vehicle by which Dilmar could receive reimbursement for the site rehabilitation costs Dilmar "incurred." In relevant part, Section 44–2–130(A) provided:

To encourage voluntary rehabilitation, *a person conducting site rehabilitation* under Section 44–2–110, which defines the early detection incentive program, either through his own personnel or subcontractors, *is entitled to* directly bill the Superb Account or *be reimbursed for reasonable costs incurred* in connection with the site rehabilitation if prior approval therefor is obtained from the department. Prior to or during the grace period established under the early detection incentive program, *the person is eligible to* directly bill or *be reimbursed for all reasonable costs incurred* in connection with site rehabilitation.

Act 486 § 2, 1988 Statutes at Large, pp. 4074–75 (emphasis added).

The entire premise of Dilmar's argument is flawed. To suggest that Dilmar did not "incur" clean-up costs until DHEC issued its second demand for repayment in December 1993 confuses the distinction between clean-up costs "incurred" (*i.e.*, those costs associated with clean-up activities Dilmar alone was required to undertake), and clean-up costs eligible for "reimbursement" (*i.e.*, those costs Dilmar could ultimately recover from DHEC). Dilmar was, and is, the party ultimately liable for cleaning up the petroleum contamination caused by its leaking underground storage tanks. DHEC, as the administrator of the Superb Account, was the party to whom Dilmar could look for *reimbursement* of clean-up costs *incurred by Dilmar.* The Superb Act speaks in terms of reimbursement for costs Dilmar, as the responsible party, "incurs." To interpret the Superb Act any other way would render the statute's language meaningless. If Dilmar did not "incur" the costs, how could it be reimbursed?

Dilmar places unwarranted significance on DHEC's December 9, 1993, letter demanding

---

**12.** *See* S.C.Code Ann. § 44–2–80 ("Any person who releases a regulated substance from an underground storage tank immediately shall undertake to contain, remove, and abate the release to the satisfaction of the department."). *See also* Subpart F of the South Carolina Underground Storage Tank Control Regulations, S.C.Code Regs. R. 61–92.280.60 *et seq.* (setting forth the

various response activities and corrective actions Dilmar must take after establishing a confirmed release of petroleum product from Dilmar's UST systems).

**13.** *See* S.C.Code Ann. § 48–1–90 (imposing liability on Dilmar for discharges of petroleum product into the environment).

repayment of Superb reimbursements. Dilmar insists this letter marks *the* critical moment when Dilmar's breach of contract action accrued. Counsel explains that by virtue of receiving this letter (which made the same demand as the previous DHEC letter dated September 3, 1992), Dilmar somehow magically "incurred" clean-up costs for which Dilmar was never before liable. According to Dilmar's supplemental brief: "Dilmar had absolutely no liability to expend money to clean up its contaminated sites until December 9, 1993, when DHEC demanded repayment of those expenses." This argument invites several obvious questions:

● How does a demand letter from DHEC cause Dilmar to "incur" clean-up costs?

● How does a demand letter from DHEC create a liability never before faced by Dilmar?

● How does a demand letter from DHEC legally oblige Dilmar to repay amounts it previously received as Superb reimbursements?

▮ The court holds that the December 9, 1993, demand letter itself does not create a cause of action against Federated, nor can it trigger the accrual of Dilmar's cause of action. The only significance that can be attributed to this demand letter is that it provided Dilmar with *yet another notice* that the 1990 Amendments: (1) retroactively invalidated Federated's Coordination of Benefits Endorsement; (2) suspended DHEC's obligations to make Superb reimbursements until the limits of the Federated Policy were exhausted; and (3) confirmed that Dilmar's cause of action accrued when the 1990 Amendments were passed.

These conclusions are best demonstrated by starting with the December 9, 1993, demand letter, then citing to the September 3, 1992, demand letter, then referencing the actual language of the 1990 Amendments upon which DHEC makes its demands for repayment.

The December 9, 1993, demand letter states, in relevant part:

Per Section 44–2–130 of the State Underground Petroleum Environmental Response Bank ("SUPERB") Act, payment of SUPERB funds at insured sites (in excess of the deductible) is not allowable until funds provided by the policy have been exhausted.

Compare this language with DHEC's September 3, 1992, demand letter, which reads, in pertinent part:

Per Section 44–2–70 of the State Underground Petroleum Environmental Response Bank (SUPERB) Act (as amended), "no insurance policy ... shall contain any terms, endorsements, conditions, provisions, or other language that requires expenditure of funds from the SUPERB Account prior to or in lieu of payment by the mechanism."

A file review reveals that an Insurance policy through Federated Insurance exists for the referenced facility with a $25,000 deductible. The policy contains a "coordination of benefits" clause which, per the statute, cannot be honored in this state, therefore additional payments from the SUPERB Account are not deemed appropriate.

Finally, compare the statutory citations referenced by DHEC as the basis of its demand to the actual language of the 1990 Amendments.

Section 44–2–130(A), as cited in DHEC's December 9, 1993, demand letter, states:

.... If a liability insurance policy or any other financial responsibility mechanism which provides coverage for sudden or nonsudden release of petroleum or petroleum products from an underground storage tank has been executed for a site at which reimbursement or direct billing from the Superb Account is sought, no funds may be expended from the Superb Account until the funds provided by the financial responsibility mechanism have been exhausted.

Act 473 § 3, 1990 Statutes at Large, pp. 2134–35.

Section 44–2–70(A), as cited in DHEC's September 9, 1992, demand letter, states

.... No insurance policy ... shall contain any terms, endorsements, conditions, provisions, or other language that requires expenditure of funds from the Superb Ac-

count prior to or in lieu of payment by the mechanism....

Act 473 § 7, 1990 Statutes at Large, pp. 2137–38.

Taken together, DHEC's demand letters, and the actual language of the 1990 Amendments to which they cite, signal clearly DHEC's position that Federated was contractually obligated to reimburse Dilmar for the clean-up costs it had incurred. These letters also notify Dilmar that *its legal right* to recovery against Federated is found in the language of the 1990 Amendments.

Dilmar's and DHEC's conduct subsequent to the December 9, 1993, demand letter completely dispels the myth that this letter marked the event giving rise to Dilmar's cause of action. As evidenced by subsequent meetings and correspondence between Dilmar and DHEC, this court finds that the parties' relationship did not change. Dilmar's deposition testimony reveals that DHEC never took any further action relating to the December 1993 demand letter and never again requested repayment. Nor did DHEC ever initiate a lawsuit or other administrative action against Dilmar. In short, after the December 1993 letter and subsequent meetings, both Dilmar and DHEC wound up in the same position as they had been in September 1992.

### 3. Dilmar's Claim That Federated Is Equitably Estopped From Raising The Statute Of Limitations.

Dilmar alternatively advanced three arguments asserting that Federated should be estopped from raising the statute of limitations as a defense to this action. Initially, Dilmar argued that Federated should be "equitably estopped" from raising the statute of limitations defense because Federated led Dilmar to conclude that a suit against Federated was unnecessary until the *Moorhead* court rendered its decision on the constitutionality of the Superb Act's invalidation of the Coordination of Benefits Endorsement. This argument is without merit.

■ To establish equitable estoppel, Dilmar must prove *Federated's conduct* induced Dilmar to delay suing. *Dillon County*

*School Dist. # 2 v. Lewis Sheet Metal Works, Inc.,* 286 S.C. 207, 332 S.E.2d 555 (App.1985). But Dilmar's president, Mr. Daniel Lane, testified unequivocally that it was *DHEC's conduct* that led to Dilmar's decision not to sue Federated:

A. The—let me refresh my sequence of events that we're talking about. We didn't really become concerned about the denial because I think in my earlier testimony I said that we were seeking reimbursement or protection, either from Federated or from the SUPERB Funding, and when we got the denial and DHEC entered the sites in the SUPERB program, *then we weren't too concerned.* Then later on when work ceased at the sites then we became concerned a little bit. That is when DHEC told us that in all probability the clause or the denial of the insurance may not be valid. But when we sought to have a conference on that or a hearing on that they said we're going to continue working *and so we were satisfied again....*

(emphasis added). Depo. of D. Lane, at 177. He also testified that after the claims were accepted for payment by Superb, he "thought everything was taken care of." *Id.* at 144. He stated that all DHEC's representations were "verbal," and there was "nothing in writing." *Id.* According to Mr. Lane, *DHEC's conduct* led to the delay in suing Federated, not any conduct of Federated.

Dilmar's testimony is consistent with the types of correspondence being sent by DHEC. On September 3, 1992, DHEC wrote Dilmar, informing it that the Coordination of Benefits Endorsement "cannot be honored in this state," and demanding repayment of Superb Account reimbursements. Dilmar immediately responded to DHEC's threats by disclaiming any responsibility to sue Federated. DHEC then wrote Dilmar on September 25, 1992, stating:

Federated's coverage denial based on the "coordination of benefits clause" for other sites in South Carolina is currently in litigation. The outcome of this litigation may determine the cost recovery actions by the Department and/or Dilmar Oil Company. It may be necessary to enter a subrogation agreement to ensure that SUPERB pay-

ments continue; you will be contacted concerning this in the near future.

DHEC never again contacted Dilmar regarding any contemplated actions against Federated. Moreover, the record establishes that DHEC never followed through on its request for a subrogation agreement to protect Dilmar's rights. DHEC simply confirmed that the issue was in litigation, and that DHEC would be contacting Dilmar "concerning this in the near future." Because Dilmar did not wish to pursue legal action against Federated itself, Dilmar testified that it was "satisfied" in believing that "everything was taken care of."

Dilmar's failure to timely file suit simply cannot be attributed to Federated's conduct. Dilmar had ample notice of its rights against Federated, and Federated did nothing to discourage Dilmar from filing suit. Both Dilmar and DHEC knew something should be done to preserve Dilmar's rights, but each deferred to the other until it was too late.

This case is **not** a situation where Dilmar made a claim to Federated, and Federated informed Dilmar that it would wait to resolve the claim until the litigation between Federated, DHEC and another insured was resolved. Instead, there is no evidence that Federated knew about DHEC's attempt to stop payment at Dilmar's sites, or to seek reimbursement of funds already paid. DHEC informed Dilmar that it would wait until the *Moorhead* litigation was resolved before determining whether it would sue and who it would sue.

Dilmar has cited no record support for its claim that it relied on any conduct or representations of Federated causing it not to file suit within the statutory limitations period. In the absence of such evidence, Dilmar cannot avoid summary judgment based upon this alternate "theory" of equitable estoppel.

On supplemental briefing, Dilmar alternatively argued a "pass-through" estoppel theory, claiming that Federated misled **DHEC**, who *in turn* misled Dilmar, into believing that no lawsuit was necessary. Dilmar's "pass-through" equitable estoppel argument is based on the deposition of Jeanne Hankerson, Home Office Manager at Federated,

taken in the *Moorhead* litigation, and the affidavit of DHEC's Stanley Clark. In response, Federated filed the affidavit of Jeanne Hankerson, and the deposition of Robert Malpass from the *Moorhead* litigation.

Dilmar cites no case authority for its contention that equitable estoppel can be applied on a "pass-through" basis. Instead, Dilmar points out that "nothing in South Carolina's law of equitable estoppel requires that the party asserting the estoppel be the direct recipient of the representations or conduct of the defendant." Dilmar also claims that it was foreseeable that Federated's representations to DHEC "would be relied on by third parties such as Dilmar."

As more fully discussed below, because the court believes that Dilmar did **not** rely on Federated's representations, either directly or as allegedly conveyed by DHEC, this theory of equitable estoppel is also rejected. In addition, the court finds no support in South Carolina law for the application of estoppel based on the conduct of an intervening third party. Finally, the record also reveals no evidence that DHEC relied on any representation of Federated. Thus, Dilmar cannot avoid application of the statute of limitations on the grounds of equitable estoppel.

The record is replete with evidence that Dilmar relied upon the statements of DHEC when Dilmar failed to timely sue Federated. However, there is no evidence in the record that DHEC told Dilmar anything that *Federated* had represented. DHEC certainly did not tell Dilmar that Federated would pay Dilmar's claims if Federated lost the *Moorhead* case. Rather, DHEC told Dilmar that "the Department is considering pursuing legal action against Federated. It may be necessary to enter a subrogation agreement to ensure that SUPERB payments continue; you will be contacted concerning this in the near future." Not surprisingly, Dilmar apparently relied on DHEC's statement that DHEC would sue Federated for Dilmar. Dilmar did *not* rely on any representation that Federated made to DHEC, which was in turn, passed on to Dilmar.

As to Federated's alleged representations to DHEC, Dilmar argues that DHEC "un-

derstood" that Federated would re-evaluate claims on which it had previously denied coverage if Federated lost the *Moorhead* case. Dilmar bases this argument on Federated's "representations" and "course of conduct" and cites the affidavit of DHEC's Stanley Clark as support. In that affidavit, Mr. Clark states that "DHEC understood Federated's position to be that Federated's denial of claims for underground storage tanks based on the Coordination of Benefits Endorsement was conditional," and that "Federated would go back and provide coverage" if the endorsement was not upheld. Mr. Clark states that DHEC's understanding was based on Jeanne Hankerson's July 25, 1991, letter to DHEC which attached a "sample denial letter" to policyholders with the Coordination of Benefits Endorsement. Mr. Clark then concludes that the sample denial letter "represents that the denial of coverage is conditional on the site being eligible for SUPERB funding and that the sites would be reevaluated if SUPERB funding was not available."

The record shows, however, that the purpose of attaching the sample letter was to determine if the denial letter alone was sufficient to satisfy DHEC that there was no insurance coverage for the site. The sample letter does not say that Federated's denial of coverage is "conditional." Nor does it say that Federated would re-evaluate in the event Superb funding was not available.

Both Dilmar and DHEC then cite to the deposition testimony of Jeanne Hankerson in the *Moorhead* case as support for their purported reliance. Ms. Hankerson's testimony related to the overall loss experience of Federated in South Carolina as compared with the premium earned:

Q. If it is ultimately determined that the coordination of benefits clause is invalid in South Carolina, what effect would that have on the all time incurred losses figure that's shown on Exhibit "A"?

A. It would lead to a substantial increase in that number without any corresponding increase in premium because we wouldn't be able to go back and charge for it, but we would have to pay those losses, and I believe there are about fifty (50) sites that would be affected.

Mr. Clark does not state that he or anyone else at DHEC relied on Ms. Hankerson's testimony. Instead he explains in his affidavit that the Hankerson testimony is "consistent with" DHEC's "understanding" of Federated's position that it would "go back and provide coverage for sites if the endorsement did not result in its insureds being eligible for Superb funding." Ms. Hankerson did not testify that Federated would not assert the statute of limitations or any other legal or policy defense to claims post-*Moorhead*. Her testimony was in the context of the overall risk posed by these claims. Ms. Hankerson's affidavit describes the context of the examination as "the total risk Federated would face." She stated she "did not have in mind and was not considering any other coverage defenses Federated might have to such claims," nor "any legal defenses Federated might have to such claims, including the statute of limitations."

Ms. Hankerson's statements in the *Moorhead* deposition simply do not rise to the level of a representation or promise to pay notwithstanding legal or policy defenses. The *Moorhead* lawsuit addressed clean-up costs that Federated had already paid, and was attempting to recover through subrogation from DHEC. Moreover, **no one** at DHEC has submitted an affidavit or other testimony stating that they relied on her testimony and believed that no lawsuit was necessary.[14]

The record reveals that several times throughout the history of the dispute over the Coordination of Benefits Endorsement—and before Ms. Hankerson's deposition was taken—DHEC apparently believed that it

---

14. Ms. Hankerson has stated that at no time did she tell DHEC, Dilmar, or anyone else that Federated would not assert the statute of limitations as a defense to claims in the event *Moorhead* was decided against Federated. She also stated that no one from DHEC or any insured ever requested a tolling agreement, or some arrangement to preserve rights pending the outcome of *Moorhead*.

had viable claims for subrogation or cost recovery against Federated and/or Federated insureds. As early as September 1992, DHEC informed Dilmar of the *Moorhead* litigation and that the "outcome of this litigation may determine the cost recovery actions by the Department and/or Dilmar Oil Company." DHEC also stated it was considering suing Federated and "[i]t may be necessary to enter a subrogation agreement to ensure that SUPERB payments continue; you will be contacted concerning this in the near future."

In December 1993, about the same time DHEC sent Dilmar a letter with an amount of funds Dilmar was required to re-pay, Federated deposed DHEC's Robert Malpass in the *Moorhead* litigation. Even though the statute of limitations had already expired by this date, during examination by counsel for DHEC, Mr. Malpass confirmed that cost recovery claims against Federated and/or the tank owners were not waived in 1989 when DHEC decided to pay claims for clean-up where tank owners had the Coordination of Benefits Endorsement.

Regardless of the reasons DHEC may have thought it still had a viable claim in December 1993, it is clear that the deposition testimony of Jeanne Hankerson in *Moorhead*, taken one month later in January 1994, was not the basis. The statute of limitations had already expired. Thus, DHEC could not have relied on Jeanne Hankerson's testimony as the reason it failed to sue Federated and/or its insureds.

The court finds that the Clark affidavit and Jeanne Hankerson's *Moorhead* testimony do not establish equitable estoppel. Even under Dilmar's "new" theory of equitable estoppel, there must be a showing that Federated's conduct lulled DHEC to sleep; that DHEC reasonably believed a lawsuit was unnecessary; and that DHEC then led Dilmar to believe the same thing. Nothing in Clark's affidavit establishes such reasonable reliance on specific conduct of Federated. To prove equitable estoppel under South Carolina law, the aggrieved party must have "reasonably relied on the words and conduct of the person to be estopped in allowing the limitations period to expire." *Dillon County*

*School Dist. # 2 v. Lewis Sheet Metal Works, Inc.,* 286 S.C. 207, 332 S.E.2d 555, 561 (App. 1985). Here, the court finds no reasonable reliance. DHEC and Dilmar failed to timely sue, or to otherwise preserve their claims. The court finds that this case is time-barred.

### 4. Dilmar's "judicial estoppel" claim.

Dilmar next contends that Federated should be "judicially estopped" from raising the statute of limitations because Federated's reliance on this legal defense is somehow inconsistent with Federated's prior statements to the *Moorhead* court. Dilmar's contention is without merit, and the doctrine of judicial estoppel is not applicable under the facts of this case.

This court notes that one of the issues in the *Moorhead* litigation was whether the 1990 and 1992 Amendments to the Superb Act, if applied retroactively, would impermissibly impair Federated's contractual rights. The trial court concluded that the amendments did not "impermissibly" impair Federated's rights, because the State had a legitimate interest in eliminating "windfall profits" to insurance companies. On appeal, Federated offered evidence to demonstrate that between 1986 and 1995, loss payments and reserves for pollution claims exceeded profits on pollution policy premiums by approximately $4.5 Million. Federated's appellate brief also noted that the established loss figures did not "include approximately 50 claims in which the Coordination of Benefits provision is involved." This statement to the *Moorhead* court references the 50 additional sites that could be affected if the Superb Act Amendments were upheld, and the Coordination of Benefits Endorsement defense invalidated.

In the Fourth Circuit, application of judicial estoppel is controlled by federal law. *Allen v. Zurich Ins. Co.,* 667 F.2d 1162, 1167–68 (4th Cir.1982). The doctrine is an instrument of the courts, not the parties, and is thus invoked at the court's discretion, as the equities of the case demand. *Hindman v. Greenville Hosp. Sys.,* 947 F.Supp. 215, 221 (D.S.C.1996). Because of the harsh results of precluding a party from asserting a

position that would normally be available to the party, "judicial estoppel must be applied with caution." *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir.1996); *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 29 (4th Cir.1995).

▮ While the circumstances under which judicial estoppel may appropriately be invoked cannot be reduced to a precise formula, there are "certain elements that have to be met before courts will apply judicial estoppel." *Lowery*, 92 F.3d at 223–24. First, the party to be estopped must be attempting to assert a position inconsistent with a stance taken in prior litigation. *Id.* Inconsistent positions are ones that are "diametrically opposed to each other." *Id.* In other words, the two positions must be irreconcilable.

An examination of Federated's arguments in *Moorhead* reveals nothing inconsistent with Federated's assertion of the statute of limitations in this case. Federated's reference to premium profit/loss records was designed to demonstrate the absence of "windfall profits" in South Carolina, without regard to the "approximately 50 claims in which the Coordination of Benefits provision is involved." No representations were made regarding whether Federated would assert the legal defenses available to it, like the statute of limitations, in cases where an insured ultimately sued Federated after the statute of limitations period had passed.

▮ Even if an inconsistent position had been advanced, that position must have been successfully advanced and accepted by the court in the previous litigation. *Lowery*, 92 F.3d at 224. As explained by the Fourth Circuit,

The insistence upon a court having accepted the party's prior inconsistent position ensures that judicial estoppel is applied in the narrowest of circumstances. Indeed, 'the prior success rule narrows the scope of judicial estoppel to the point at which the necessity of protecting judicial integrity outweighs the ramifications of that protection upon the litigant and the judicial process.'

*Lowery*, 92 F.3d at 224. As Judge Posner aptly stated:

The doctrine presupposes a judgment (or its administrative equivalent), for all it does is forbid a person who has won a judgment on one ground to repudiate that ground in a subsequent litigation in an effort to obtain a second judgment. It is thus about abandoning winning, not losing, grounds.

*Patz v. St. Paul Fire & Marine Ins. Co.*, 15 F.3d 699, 701 (7th Cir.1994).

The "prior success rule" is based upon the overriding rationale behind the doctrine of judicial estoppel—protection of judicial integrity. The rule is based on the following logic: "If there was no previous judicial acceptance of the contrary position, then there is no risk of inconsistent results. If there is no risk of inconsistent results, then the integrity of the judicial process is unimpaired. If the integrity of the judicial process is unimpaired, then there is no policy justification warranting application of estoppel. Therefore, logic dictates that prior success is a necessary prerequisite to application of the doctrine." *See* Rand G. Boyers, Comment, ***Precluding Inconsistent Statements: The Doctrine of Judicial Estoppel***, 80 Nw. U.L.Rev. 1244, 1253 (1986) (cited with approval on this point by the Fourth Circuit in *Lowery*, 92 F.3d at 224).

Examination of the decisions in *Moorhead* demonstrates that Federated's arguments on profit loss records were not only **not** accepted by the court, they were never even considered. Both the circuit court, and the South Carolina Supreme Court completely ignored this issue. *See Moorhead*, 476 S.E.2d at 486–88 (holding that there was no "substantial impairment" of Federated's contract rights because the State of South Carolina had complete freedom to administer the Superb fund as it saw fit, and Federated had no reasonable expectation to rely on the law remaining unchanged in this area, given the high degree of state regulation over environmental issues, as well as the State's interest as a sovereign in administering a state-created fund).

▮ Federated saw no success of any kind during the *Moorhead* litigation. No

fact or legal conclusion advanced by Federated was ever accepted by the court. Moreover, the statute of limitations was not an issue in *Moorhead.* Federated did not take a position inconsistent with raising the statute of limitations in a subsequently filed lawsuit. Thus, no inconsistent position was advanced nor accepted by the *Moorhead* court.

█ The final and most critical element of judicial estoppel is that the party to be estopped must have " 'intentionally misled the court to gain unfair advantage.' " *Lowery,* 92 F.3d at 224. Judicial estoppel will not apply "when a party's prior position was based on inadvertence or mistake." *Id.* (quoting *Faggert & Frieden,* 65 F.3d at 29 ("[t]he vice which judicial estoppel prevents is the cold manipulation of the courts to the detriment of the public interest")).

This court, having analyzed the relevant *Moorhead* documents and the record of this case, concludes that Federated has not manipulated the judicial system. Federated never stated that it would not challenge untimely filed lawsuits. Nor did it ever state that it would not assert a legal defense available to it in cases where, as here, an insured failed to timely sue.

**B. Dilmar's Claim Based On The 1994 Government–Mandated Off–Site Clean–Up At The Rice Planters Site.**

Federated has also moved for summary judgment on Dilmar's claim for coverage on the Rice Planters Site. Federated does not, however, assert that the statute of limitations bars Dilmar's claim. Rather, Federated asserts that because no Federated "claims-made" pollution policy was in effect in June 1994 when DHEC ordered Dilmar to remediate the Rice Planters Site, no coverage exists for this claim. Based upon the clear and unambiguous language of the Federated Policy, this court agrees with Federated, and concludes that Federated is entitled to a declaration of no coverage as to the Rice Planters Site claim.

In order to appropriately address the issues presented by the Rice Planters Site claim, the court finds it necessary to re-examine the Federated Policy at issue. The Policy contains three separate and distinct insuring agreements. Insuring Agreement 1 provides coverage for non-governmental third-party "Bodily Injury and Property Damage Liability" claims for compensatory damages. But Insuring Agreement 1 will not provide coverage unless an appropriate "claim" is made against the insured "during the policy period."

> **This insurance applies** to "bodily injury" and "property damage" **only if a claim** for damages because of the "bodily injury" or "property damage" **is first made in writing against any insured during the policy period.** (Emphasis added).

Insuring Agreement 2 provides coverage for "Reimbursement of [Governmentally] Mandated Off–Site 'Clean-up Costs' " where notice asserting such an obligation is received by the insured "during the policy period."

> **The insured's obligation to pay "clean-up costs" because of "environmental damage" must be asserted under statutory authority of the government** of the United States of America, Canada or any political subdivision of the United States or Canada. **Notice asserting such obligation must be first received by you during the policy period.** (Emphasis added).

Insuring Agreement 3 provides coverage for "Voluntary [First–Party] Clean-up Costs Reimbursement," but only if the insured initiates the clean-up at the insured site during the policy period, and gives Federated immediate notice of the pollution incident.

> **We will reimburse the insured for other "clean-up costs" initiated at the "insured site" during the policy period that the insured incurs, provided that:**
>
> a. **The insured gives us immediate notice** of an actual or suspected "pollution incident" that commences on or after the Retroactive Dates shown in the Declarations. (Emphasis added).

Each Insuring Agreement is written to cover a distinct type of claim. Insuring Agreements 1 and 2 provide coverage for different types of "third-party" claims against the insured during the policy period. Insuring Agreement 1 applies only to non-

governmental third-party claims for compensatory damages for "bodily injury" or "property damage" against the insured during the policy period. Insuring Agreement 2 applies only to situations where the insured is subject to a "governmental" directive to pay clean-up costs during the policy period.

On the other hand, Insuring Agreement 3 provides "first party" coverage, limited in scope to those situations where the insured "voluntarily" initiates clean-up at an "insured site" during the policy period. Insuring Agreement 3 is unambiguously entitled "Voluntary 'Clean–Up Costs' Reimbursement" coverage, and speaks in terms of reimbursing the insured for "other" clean-up costs (*i.e.,* non-governmentally mandated costs) that the insured incurs at the "insured site."

Only Insuring Agreement 2 could apply to the new Rice Planters claim because that claim arose as a result of a government directive to Dilmar to clean-up the Rice Planters Site. But this coverage requires that "[n]otice asserting such obligation must be first received by [the insured] during the policy period." Because Dilmar did not receive DHEC's June 1994 order mandating clean-up at the Rice Planters Site "during the policy period." Insuring Agreement 2 does not provide coverage.

In order to avoid the "claims made" limitation in Insuring Agreement 2, Dilmar contends the Rice Planters Site claim falls solely under Insuring Agreement 3. According to Dilmar, because the Rice Planters Site contamination had migrated from a site (Northside Texaco) at which Dilmar had voluntarily initiated some clean-up measures in 1989, the Rice Planters Site is necessarily a continuation of that voluntary clean-up thus implicating only Insuring Agreement 3. This argument, however, is contrary to the language of the Policy and established South Carolina law.

In 1989, Dilmar voluntarily conducted a risk assessment at Northside Texaco along with all its other sites in an effort to obtain Superb coverage during the amnesty period. The risk assessment confirmed environmental contamination at Northside Texaco and many of Dilmar's other sites. Dilmar notified Federated on June 15, 1989, of the results of this assessment, and made a first-party claim for voluntary clean-up on the pollution policy.[15] No demand, mandate or order was made on Dilmar by any government authority that it conduct any remedial activities at Northside Texaco. Rather, the clean-up of Northside Texaco was conducted voluntarily by Dilmar with approval by DHEC.

When Dilmar submitted its 1989 claim for Northside Texaco, only Insuring Agreement 3 applied because no demand had been made of Dilmar by a third-party government authority. Because Dilmar's 1989 claim was one for first-party voluntary clean-up coverage, the 1994 demand made by DHEC ordering Dilmar to respond to remediation at the Rice Planters Site represents the first claim made against Dilmar by a third-party governmental authority. The 1989 and 1994 claims are fundamentally different and invoke different insuring agreements.

■ The focus under a claims-made policy is the type of claim and the date it was asserted. Dilmar's 1989 claim was a *first-party* claim made *by the insured* for voluntary clean-up. The 1994 claim was a *third-party* claim made by a governmental authority *against the insured* for mandated clean-up. No claim for government mandated clean-up costs was made against Dilmar until June 30, 1994. Because there was no pollution policy in effect on this date, there is no coverage.

■ South Carolina law requires that if a policy's language is unambiguous, the language alone determines the policy's force and effect, and each term within the insurance policy must be given its intended purpose. *Torrington Co. v. Aetna Cas. & Sur. Co.,* 264 S.C. 636, 216 S.E.2d 547, 550 (1975). Moreover, these insuring agreements are mutually exclusive and provide coverage for three separate and distinct events. *See A.J. Hall, Inc. v. Federated Mut. Ins. Co.,* 1996 WL 23368,

---

**15.** Federated denied the claim in July 27, 1989, based on the Coordination of Benefits endorsement.

*5 (Tenn.App.1996) (court addressed identical Federated pollution policy holding that the insuring agreements impose "separate and distinct" obligations). Each of these respective insuring agreements must be given its intended force and effect. *Sphere Drake Ins. Co. v. Litchfield*, 313 S.C. 471, 438 S.E.2d 275, 277 (App.1993). Thus, a claim falling under one particular insuring agreement cannot implicate coverage under one of the other insuring agreements. To hold otherwise would torture the clear and unambiguous policy language to extend coverage that was never intended by Federated in direct contradiction of established South Carolina law. *See Torrington*, 216 S.E.2d at 550.

The Rice Planters Site is not a voluntary clean-up claim. There is no evidence that Dilmar had conducted or was planning to conduct any *voluntary* clean-up activities at the Rice Planters Site. Rather, the only reason this site is a part of this lawsuit is because DHEC notified Dilmar that it was *obligated* to clean up this property. As a governmental mandate that Dilmar respond to contamination, the Rice Planters claim falls under Insuring Agreement 2—Reimbursement of Mandated Clean–Up Costs—which requires that notice asserting such obligation be received by the insured during the policy period. As the DHEC notice requiring Dilmar to respond to the Rice Planters contamination was received years after the expiration of the last Federated pollution policy, there is no coverage.

Finally, Dilmar contends Federated is responsible for the damage at the Rice Planters because the Northside Texaco contamination was allowed to migrate off-site by a delay in clean-up caused by Federated's refusal to provide coverage. This assertion is unsubstantiated and is therefore rejected by the court.

Based upon the foregoing findings and conclusions, this court holds that the Federated Policy at issue does not provide coverage for the 1994 Rice Planters Site claim. Accordingly, Federated is entitled to a declaration of no coverage as a matter of law.

## C. Dilmar's Bad Faith Claim

Although Dilmar pleaded a bad faith claim against Federated in its Complaint, and opposed Federated's motion for summary judgment on that claim, the court finds that Dilmar has abandoned its bad faith cause of action.

■ On the "bad faith" breach of contract claim, Dilmar's initial opposition to summary judgment asserted that Federated's failure to affirmatively provide notice and reassess coverage after passage of the 1990 Amendments constituted a "bad faith or unreasonable action *in breach* of an implied covenant of good faith and fair dealing arising on the contract." On supplemental briefing, recognizing that this position would result in a May 1990 accrual date, Dilmar contended: "Although Federated did not voluntarily offer coverage to Dilmar after the 1990 amendments became effective, Federated's failure to volunteer coverage should not be considered a denial of coverage, because Dilmar never made a demand for coverage at that time." By acknowledging that Federated's failure to volunteer coverage where no re-tender had been made was not a "denial" of coverage, Dilmar has necessarily abandoned its bad faith claim.

## IV. DILMAR'S MOTION TO AMEND

Dilmar filed a Motion to Amend Complaint and to Join a Party on November 26, 1996. By its motion and proposed Amended Complaint, Dilmar seeks to join DHEC as a defendant so that this court may declare Dilmar's and DHEC's respective rights *in the absence of Federated insurance coverage.* DHEC also filed a brief in support of the amendment and appeared at the hearing of this motion. This court concludes Dilmar's Motion to Amend is untimely, and seeks to assert claims against DHEC wholly unrelated to the insurance coverage issues presently before the court. In short, Dilmar's attempted joinder of DHEC is too late, and the proposed claims against DHEC are too different to be appropriately addressed in this lawsuit.

As previously stated, Dilmar initiated this lawsuit against Federated on January 12,

1996. This court issued its Rule 16(b) Scheduling Order on January 25, 1996. That Order mandated that any motion to join other parties and amend the complaint must be filed by June 12, 1996. Dilmar never requested an extension of time to join additional parties.

■ Where, as here, a motion to amend the pleadings and join additional parties is filed after the scheduling order deadline, a "two-step analysis" is required. Once a scheduling order's deadline for amendment of pleadings has passed, a movant must *first* demonstrate to the court that it has a "good cause" for seeking modification of the scheduling deadline under Rule 16(b). If the movant satisfies Rule 16(b)'s "good cause" standard, it must *then* pass the requirements for amendment under Rule 15(a). *Smith v. United Parcel Service, Inc.,* 902 F.Supp. 719, 720 (S.D.W.V.1995); *Marcum v. Zimmer,* 163 F.R.D. 250–254 (S.D.W.V.1995); *Forstmann v. Culp,* 114 F.R.D. 83, 85–86 (M.D.N.C.1987); *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604 (9th Cir.1992).

Rule 16 was drafted to prevent parties from disregarding the agreed-upon course of litigation. The Rule assures the court and the parties that "at some point both the parties and the pleadings will be fixed." Advis. Comm. Notes for 1983 Amend. Consistent with the Rule's intent, this court has admonished litigants that "[a] scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *Jordan v. E.I. du Pont de Nemours,* 867 F.Supp. 1238, 1250 (D.S.C.1994) (*citing Johnson,* 975 F.2d at 610).

■ Rule 16(b)'s "good cause" standard is much different than the more lenient standard contained in Rule 15(a). Rule 16(b) does not focus on the bad faith of the movant, or the prejudice to the opposing party. Rather, it focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment. *Smith,* 902 F.Supp. at 720; *Marcum,* 163 F.R.D. at 254; *Forstmann,* 114 F.R.D. at 85; *Johnson,* 975 F.2d at 609. Properly construed, "good cause" means that scheduling deadlines cannot be met despite a party's diligent efforts. 6A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Procedure § 1522.1 at 231 (2d ed. 1990). In other words, this court may "modify the schedule on a showing of good cause if [the deadline] cannot be met despite the diligence of the party seeking the extension." Advis. Comm. Notes for 1983 Amend.; *Forstmann,* 114 F.R.D. at 85. Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief. *Johnson,* 975 F.2d at 609.

Dilmar's Motion to Amend does not even acknowledge that this court's Rule 16(b) Scheduling Order required joinder by June 12, 1996. But now—more than five months after the Scheduling Order deadline—Dilmar asserts that "joinder will clarify and crystallize the pleadings and the rights between the parties." This court concludes that Dilmar could have moved to join DHEC in a timely fashion, but did not. Indeed, Dilmar's proposed claim against DHEC is based on the same issue that was known to Dilmar prior to initiating this lawsuit, namely: What happens if this court determines that there is no insurance coverage under the Federated policies? This court concludes that Dilmar charted the course for this litigation when it chose to pursue only Federated—putting off its dispute with DHEC for another day. Dilmar's Complaint and subsequent discovery was crafted solely to address insurance coverage issues. While Dilmar's Motion to Amend could be denied on this basis alone, this court concludes that Dilmar's Motion to Amend should also be denied under Rule 15(a).

■ Under Rule 15(a), the decision to grant leave to amend a complaint is committed to this court's discretion. *Foman v. Davis,* 371 U.S. 178, 181, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Rule 15(a) stipulates that leave may be granted *only* "when justice so requires." Leave to amend under Rule 15(a) is not granted automatically. *Deasy v. Hill,* 833 F.2d 38, 40 (4th Cir.1987). A motion to amend the complaint under Rule 15(a) should be made "as soon as the necessity for altering the pleading becomes apparent." *Id.* at 41.

Moreover, belated claims that change the character of litigation are not favored. *Deasy v. Hill,* 833 F.2d 38, 42 (4th Cir.1987); *see also Isaac v. Harvard University,* 769 F.2d 817, 829 (1st Cir.1985) (no abuse of discretion where district court denied amendments which would "very materially change the nature of the complaint"); *Mercantile Trust Co. v. Inland Marine Products Corp.,* 542 F.2d 1010, 1013 (8th Cir.1976) (no abuse of discretion where district court refused to allow late amendment which would add new theories of defense and which "would necessarily reopen much of discovery").

The record establishes that Dilmar knew, prior to initiating this lawsuit, that its rights vis a vis DHEC might need to be resolved. But Dilmar chose not to assert those claims until discovery had closed, and the case was set for trial. Under these circumstances, this Circuit has denied plaintiffs' requests to amend their complaints. *See Wildauer v. Frederick County,* 993 F.2d 369, 372 (4th Cir.1993) (refusal to permit amendment proper where motion was not made until after deadline and necessary information was available to plaintiff much earlier); *Sandcrest Outpatient Services v. Cumberland County Hosp.,* 853 F.2d 1139 (4th Cir.1988) (plaintiff should have known of claim at outset); *First National Bank of Louisville v. Master Auto Service Corp.,* 693 F.2d 308, 314 (4th Cir.1982) (motion to amend properly denied when made nineteen days before trial and where amendment was not the result of movant's discovery of new facts); *Woodson v. Fulton,* 614 F.2d 940, 942–43 (4th Cir.1980); *see also GSS Properties, Inc. v. Kendale Shopping Center, Inc.,* 119 F.R.D. 379, 380–81 (1988) (motion to amend complaint denied where delay was blatant, and plaintiff knew of facts constituting basis for amendment prior to filing the action).

At its inception, this lawsuit was strictly about insurance coverage. Dilmar's attempt to join DHEC as a party *expressly* changes the character of this case by combining Dilmar's *insurance coverage claims* against Federated and Dilmar's *statutory claims* against DHEC. Dilmar's proposed Amended Complaint alleges, in pertinent part:

25. If it should be determined in this action that plaintiff is not entitled to coverage under the policies issued to it by Federated, then plaintiff is entitled to an order declaring whether or not it is entitled to recover from the SUPERB Fund as administered by DHEC, any amounts required for cleanup of the referenced Sites.

The discordant nature of Dilmar's claims is apparent. Dilmar's position throughout the pendency of this lawsuit has been that the Federated Policy provides coverage for Dilmar's environmental clean-up claims. Now Dilmar requests leave to amend its complaint and litigate whether Dilmar has a statutory remedy against DHEC in the event the Federated Policy does not provide coverage.

Dilmar's proposed claim against DHEC involves numerous Superb Act administrative issues. In the absence of Federated insurance coverage, DHEC and Dilmar will likely address whether: (1) Dilmar's sites were "eligible" sites under the Superb Act; (2) Dilmar is entitled to continuing Superb Fund reimbursement; (2) DHEC is entitled to recover past Superb Fund payments made to Dilmar; (3) Dilmar is liable for contamination at the Rice–Planters Site; (4) site remediation costs incurred at Dilmar's sites were customary, reasonable and necessary; and (5) Dilmar has the right to address these issues in court without first exhausting all administrative remedies.

Because this lawsuit, to date, has centered exclusively on insurance issues, no discovery relative to Dilmar's claim against DHEC has been conducted. An amendment of the magnitude requested by Dilmar near the time of trial is particularly disruptive. In fairness to all parties, permitting joinder now would require the court to continue the trial and reopen discovery. Discovery relating to these issues could be protracted. Briefing regarding statutory construction, administrative regulations, and other legal issues wholly unrelated to insurance coverage would be extensive.

█ Addressing Dilmar's proposed claim against DHEC would not serve judicial economy. Dilmar's claim against DHEC is at "square one." And this court can see no reason why justice would require resolution of this claim in federal court. There is no

diversity between Dilmar and DHEC, and no federal question to address. Dilmar and DHEC are free to resolve their issues before the South Carolina state courts, and neither party would be prejudiced by this court's abstention.

Based upon the foregoing, Dilmar's Motion to Amend is denied pursuant to Rule 16(b) and Rule 15(a).

### V. FEDERATED'S MOTION TO STRIKE

Federated filed a Motion to Strike Additional Submissions of Dilmar Oil Company on February 7, 1997. Specifically, Federated asked this court to strike the affidavit of Stanley L. Clark and Dilmar's submission of the deposition of Jeanne Hankerson in *Moorhead.* The court has reviewed Federated's motion, and denies it. The court has considered all affidavits, depositions, and other filings submitted by the parties.

### VI. CONCLUSION

For the foregoing reasons the court: (1) grants Federated's Motion for Summary Judgment; (2) denies Dilmar's Motion to Amend Complaint and to Join a Party; and (3) denies Federated's Motion to Strike Additional Submissions of Dilmar Oil Company.

IT IS SO ORDERED.